James M. WHEELER, M.D., Appellant,

v.

THE METHODIST HOSPITAL,
Appellee.

No. 01–98–00922–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

Dec. 19, 2002.

Bobbie G. Bayless, Spencer Warren Creed, Houston, for Appellant.

Kenneth E. Broughton, Houston, for Appellee.

Panel consists of Justices HEDGES,* NUCHIA and DUGGAN.**

## OPINION ON REHEARING

LEE DUGGAN, JR., Justice (Retired).

Appellant's motion for rehearing is denied, the opinion issued in this case on December 28, 2000 is withdrawn, and the following opinion is issued in its place, changing our treatment of appellant's issues on discovery (one, two, three, five, and six) and immunity (seven).

Appellant, James M. Wheeler, M.D., appeals a summary judgment in favor of appellee, The Methodist Hospital. We reverse and remand.

### I.

### Factual Background

Wheeler is a physician specializing in obstetrics and gynecology. From approximately July 1988 until March 1995, he had privileges to practice at Methodist. During this time, Wheeler entered into a practice improvement plan (PIP) that restricted his practice. As part of the PIP, he was required to consult with certain doctors in connection with his treatment of

---

* Justice O'Connor, former Justice, Court of Appeals, First District of Texas at Houston, participated in the original opinion. Justice O'Connor retired and did not participate in this opinion on motion for rehearing. Justice

Hedges participated in this opinion on motion for rehearing.
** The Honorable Lee Duggan, Jr., retired Justice, Court of Appeals, First District of Texas at Houston, sitting by assignment.

patients. In March 1995, Wheeler performed a successful outpatient procedure, after which the patient requested to go home. When Wheeler attempted to contact certain physicians for consultation (to comply with the PIP), his calls were not returned. Rather than wait for a returned phone call from one of these physicians while the patient remained in the hospital, Wheeler allowed the patient to go home as requested. Shortly thereafter, on March 17, 1995, Wheeler was contacted by telephone by Drs. David Zepeda and Terry Simon. (Dr. Zepeda was the acting chief of staff because the chief of staff, Dr. Joe Leigh Simpson, was out of town.) Later that same day, Wheeler voluntarily resigned from Methodist. The substance of the telephone conversation between Wheeler, Zepeda, and Simon is disputed— Wheeler said they informed him that he *would be suspended* when Dr. Simpson returned from out of town because, by discharging his patient before obtaining a consultation, he did not comply with the PIP; Drs. Zepeda and Simon said they informed Wheeler that he *was suspended.*

On March 24, 1995, Methodist notified Wheeler by letter that his voluntary resignation had been received. The letter stated:

This will serve as official notification of the acceptance of your voluntary res-

ignation from the Medical Staff of The Methodist Hospital, notice of which was received in the Hospital's Medical Staff Services Department at 3:30 p.m., on Friday March 17, 1995.

Please be advised that as your Medical Staff membership and clinical privileges *were suspended at the time of your resignation, the Hospital will list your status as suspended,* until final approval of your deletion from the Medical Staff by the Board of Directors, whose next meeting is scheduled for Wednesday, July 26, 1995.

*As you voluntarily resigned while under investigation,* the Hospital, as required, will report this action to the National Practitioner Data Bank through the Texas State Board of Medical Examiners.

Should you have any questions, please feel free to contact Mrs. Jane B. Lee, Senior Vice President, or Mrs. Claire Reid, Manager, Medical Staff Services.

(Emphasis added).

As stated in the letter to Wheeler, Methodist issued an adverse action report (the "Report") to the National Practitioner Data Bank ("the Data Bank").[1] The Report, which identifies Methodist as the reporting entity and the individual submit-

---

1. The reporting requirement that applies to physicians and health-care entities is found in the Health Care Quality Improvement Act of 1986 (HCQIA), 42 U.S.C.A. §§ 11101–11152 (West 2000). Under the HCQIA, the medical peer review committees are obligated to report to a state board of medical examiners, *inter alia,* "a professional review action that adversely affects the clinical privileges of a physician for a period longer than 30 days," the acceptance of "the surrender of clinical privileges of a physician" while the physician is under investigation for possible incompetence or improper professional conduct, or the acceptance of the physician's surrender of professional privileges "in return for not con-

ducting such an investigation or proceeding." 42 U.S.C.A. § 11133(a)(1). Each board of medical examiners receives information from the health-care entities across the state regarding the revocation, suspension or surrender of a physician's license, and the denial of staff privileges. 42 U.S.C.A. § 11133(a)(1). The board of medical examiners then reports instances in which a health-care entity has denied an individual physician clinical privileges, and instances in which it has changed or modified such privileges, when the denial or change is based on incompetence or improper professional conduct. *See* 42 U.S.C.A. §§ 11133(a)-(b); 11151(10).

ting the report as Claire W. Reid (the manager of Methodist's medical staff services), provides as follows:

> Date of the Report: 03/20/95
>
> Report Type: Unknown
>
> Type of Action Taken: Clinical Privileges (C)
>
> Action Classification: VOL SURR OF PRIV: OTHER (63590)
>
> Date of the Action: 03/17/95
>
> Length of Action: PERMANENT
>
> Effective Date: 03/17/95
>
> Reporter's Description of Action: On 3/17/95, James M. Wheeler, M.D., was summarily suspended for failure to adhere to the terms of a practice improvement plan (PIP). The PIP was developed based on concerns identified by the serviceQM [sic] committees during intensive review of his cases. Concerns included: performing cystoscopies without delineated privileges; frequent lavh [sic] complications; failure to secure timely surgical consults; questionable indications for induction of labor; unusual for-

cepts [sic] complications; failure to respond to emergency calls; following notice of suspension, Dr. Wheeler resigned later that same day.

Wheeler, however, claims the statement in the Report that he was "summarily suspended for failure to adhere to the terms of a PIP" is false.

## II.

## Procedural History

■ On November 13, 1996, Wheeler filed suit against Methodist alleging defamation and business disparagement.[2] Methodist responded with a general denial and the affirmative defenses of (1) the statute of limitations, (2) statutory privileges under the Texas Medical Practice Act (TMPA), article 4495b of the Texas Revised Civil Statutes,[3] and the Health Care Quality Improvement Act (HCQIA), 42 U.S.C.A. §§ 11101–52, and (3) Texas common law privileges. Based on these same affirmative defenses, Methodist also filed a motion for summary judgment under Rule 166a(b).[4] The trial court granted

**2.** Wheeler's appellate brief also discusses claims for intentional infliction of emotion distress and tortious interference with a contract. However, his second amended petition asserts only claims of defamation and business disparagement. If these claims were set out in Wheeler's first amended petition (which is not a part of the appellate record), Wheeler abandoned them by not including them in his second amended petition. *See* TEX. R. CIV. P. 65; *Radelow-Gittens Real Property Mgmt. v. Pamex Foods*, 735 S.W.2d 558, 559 (Tex.App.-Dallas 1987, writ ref'd n.r.e.) Therefore, we do not consider whether summary judgment was appropriate on those claims.

**3.** Act of June 1, 1987, 70th Leg., R.S., ch. 596, § 18, 1987 Tex. Gen. Laws 2333–2337, *repealed by* Act of May 13, 1999, 76th Leg., R.S., ch. 388, § 6(a), 1999 Tex. Gen. Laws 1431, 2440 (hereinafter referred to as TEX. REV. CIV. STAT. ANN. art. 4495b). The sub-

stantive provisions of the Texas Medical Practice Act at issue in this opinion are now contained in TEX. OCC. CODE ANN. §§ 160.001–07 (Vernon 2000). This opinion is governed by art. 4495b, however, which was in effect when Wheeler filed his law suit. The reporting, confidentiality, and immunity provisions of the repealed TMPA at issue in this opinion, and the current Texas Occupation Code provisions, do not differ in substance.

**4.** Methodist's motion for summary judgment is only partially a Rule 166a(i) no-evidence motion. A no-evidence motion must specifically challenge one or more specific elements of a claim or defense on which the *opposing* party bears the burden of proof. *See* TEX. R. CIV. P. 166a(i). Methodist's motion was based on some affirmative defenses, such as limitations and absolute immunity, that Methodist had the burden to establish as a matter of law. *See* TEX. R. CIV. P. 166a(i). Howev-

summary judgment in favor of Methodist without stating the precise grounds for its decision.

Wheeler appealed the summary judgment. After reviewing the appeal, this Court determined that the judgment, which lacked a "Mother Hubbard clause," did not dispose of Wheeler's disparagement claim. Because Methodist did not challenge Wheeler's claim for business disparagement in its motion for summary judgment, we determined the summary judgment was interlocutory and abated the appeal with instructions that Wheeler show us within 60 days that the business disparagement claim was disposed of, or the appeal would be dismissed for want of jurisdiction. Wheeler obtained a severance of the business disparagement claim within the requisite time period, rendering the summary judgment final for the purposes of this appeal. Thus, Wheeler's only claim before us on appeal is for defamation.

## III.

### Standard of Review

Summary judgment is proper only when a movant establishes that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Randall's Food Mkts., Inc. v. Johnson,* 891 S.W.2d 640, 644 (Tex.1995); *Marchal v. Webb,* 859 S.W.2d 408, 412 (Tex.App.-

Houston [1st Dist.] 1993, writ denied). A defendant is entitled to summary judgment if the evidence disproves as a matter of law at least one element of each of the plaintiff's causes of action or if the evidence establishes an affirmative defense as a matter of law. *Johnson,* 891 S.W.2d at 644; *Marchal,* 859 S.W.2d at 412. Once the movant has established a right to a summary judgment, the burden shifts to the nonmovant, who must respond and present any issues that would preclude summary judgment. *City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678 (Tex.1979); *Marchal,* 859 S.W.2d at 412.

On appeal, we cannot consider any ground for reversal that was not expressly presented to the trial court by written motion, answer, or other response to the motion for summary judgment. *Clear Creek Basin Auth.,* 589 S.W.2d at 677; *Hussong v. Schwan's Sales Enter., Inc.,* 896 S.W.2d 320, 323 (Tex.App.-Houston [1st Dist.] 1995, no writ). We will affirm the summary judgment if any theory advanced in the motion for summary judgment is meritorious. *Cincinnati Life Ins. Co. v. Cates,* 927 S.W.2d 623, 626 (Tex. 1996); *Cigna Ins. Co. v. Rubalcada,* 960 S.W.2d 408, 411 (Tex.App.-Houston [1st Dist.] 1998, no pet.).

Methodist argued in the trial court that it was entitled to summary judgment because: (1) Wheeler's defamation claim was

---

er, Wheeler, as a plaintiff, had the burden of establishing "a threshold standard of malice [on the part of Methodist] to state a cause of action" and overcome the TMPA's immunity provisions for reporting adverse employment action against a physician. *See St. Luke's Episcopal Hosp. v. Agbor,* 952 S.W.2d 503, 509 (Tex.1997). Methodist argued in its summary judgment motion that Wheeler did not provide evidence of malice; therefore, we evaluate this argument under the no-evidence standard of Rule 166a(i). *See, e.g., Denton v.*

*Big Spring Hosp. Corp.,* 998 S.W.2d 294, 298–99 (Tex.App.-Eastland 1999, no pet.) (applying Rule 166a(i)'s summary judgment standard to determine whether the plaintiff established malice under the TMPA); *but see Hight v. Dublin Veterinary Clinic,* 22 S.W.3d 614, 618–19 (Tex.App.-Eastland 2000, pet. denied) (determining that, as with a standard summary judgment motion, "summary judgment evidence proffered by the movant is not to be considered in determining a no-evidence summary judgment").

barred by the statute of limitations; (2) Methodist was entitled to statutory immunity for its actions; and (3) Methodist's communications were privileged. On appeal, Wheeler asserts in his first three issues that the trial court erred in denying his motion to compel the production of discovery.[5] In his fourth through ninth issues, Wheeler asserts the trial court improperly granted summary judgment in favor of Methodist.

## IV.

## Analysis

We need not determine whether the trial court erred in denying Wheeler's discovery requests if Methodist was entitled to summary judgment as a matter of law based on any of its affirmative defenses. Therefore, we begin our analysis with Wheeler's fourth issue.

### A. Issue four—Whether Wheeler's claim is barred by limitations.

Methodist argued in its summary judgment motion that it was entitled to summary judgment as a matter of law, because: (1) Wheeler's defamation claim was filed after the one-year statute of limitations expired; (2) the discovery rule did not apply to toll the limitations period; or (3) if the discovery rule did apply, Wheeler did not exercise reasonable care and diligence to discover the nature of his injury. In his fourth issue, Wheeler argues the trial court erred in granting summary judgment because Wheeler's claim is not barred by limitations, or, alternatively, because there is a genuine issue of material fact regarding the discovery rule exception.

### 1. Accrual in a defamation cause of action

■■■ When the statute of limitations expired depends on when Wheeler's cause of action accrued. Generally, a defamation claim accrues when the matter is published or circulated. *Roe v. Walls Regional Hosp., Inc.*, 21 S.W.3d 647, 651 (Tex.App.-Waco 2000, no pet.). However, the discovery rule applies to a defamation claim if the matter is not public knowledge. *Marshall Field Stores, Inc. v. Gardiner*, 859 S.W.2d 391, 394 (Tex.App.-Houston [1st Dist.] 1993, writ dism'd w.o.j.); *see Kelley v. Rinkle*, 532 S.W.2d 947, 949 (Tex.1976). When the discovery rule applies, it defers the accrual of a cause of action until a plaintiff discovers or, through the exercise of reasonable care and diligence, should discover the nature of the injury. *Childs v. Haussecker*, 974 S.W.2d 31, 37 (Tex. 1998); *Wilson v. John Daugherty Realtors, Inc.*, 981 S.W.2d 723, 726–27 (Tex.App.-Houston [1st Dist.] 1998, no pet.).

By federal and state law, Methodist's Report to the Data Bank is not a public record—information reported to the Data Bank is considered confidential, and disclosure of such information is limited to hospitals, boards of medical examiners or other State licensing boards, and physicians requesting information about themselves.[6]

---

5. Generally, the discovery he requested concerned the peer review process that led to his suspension and proof of the PIP.

6. The Data Bank must disclose information concerning a physician upon request by a hospital with whom the physician is employed or by health care entities "which have entered or may be entering employment or affiliation relationships with a physician." 45 C.F.R.

§ 60.11(a)(1), (4) (West 2000). A hospital must request such information from the Data Bank when a physician applies for a position on its medical staff or for clinical privileges at the hospital, and must request such information every two years for any physician on its medical staff or with clinical privileges. 45 C.F.R. § 60.10(a)(1), (2) (West 2000). A fine of up to $10,000 for each violation may be

*See* 45 C.F.R. § 60.11(a)(1)-(7); 42 U.S.C.A. § 11137(b)(1); TEX. REV. CIV. STAT. ANN. art. 4495b § 5.06(c) (repealed 1999) Thus, because the Report is *not* a matter of public knowledge, the limitations period on Wheeler's defamation claims began to run when he learned of, or should by reasonable diligence have learned of, the existence of the Report. *See Kelley,* 532 S.W.2d at 949 (addressing commencement of limitations period for defamation based on credit report).

### 2. Burden of proof for the discovery rule

 When, as here, a plaintiff pleads the discovery rule and a defendant moves for summary judgment on the basis of limitations, the defendant must conclusively prove the date of accrual and negate the discovery rule. *See Weaver v. Witt,* 561 S.W.2d 792, 794 (Tex.1977); *Wilson,* 981 S.W.2d at 727. To negate the discovery rule, Methodist had the burden to prove, as a matter of law, that there is no genuine issue of material fact about when Wheeler discovered or, through the exercise of reasonable diligence, should have learned of the existence of the Report. *See Childs,* 974 S.W.2d at 44. When Wheeler discovered or should have discovered the existence of the Report, and whether Wheeler exercised due diligence, are questions of fact. *See Southwestern Bell Media, Inc. v. Lyles,* 825 S.W.2d 488, 493 (Tex.App.-Houston [1st Dist.] 1992, writ denied); *Heron Fin. Corp. v. U.S. Testing Co., Inc.,* 926 S.W.2d 329, 332 (Tex.App.-Austin 1996, writ denied). However, if reasonable minds could not differ about the conclusion

to be drawn from the facts in the record, then the start of the limitations period may be determined as a matter of law. *Childs,* 974 S.W.2d at 44.

### 3. Methodist's summary judgment evidence

 Wheeler filed suit against Methodist on November 13, 1996, more than one year after Methodist filed the Report with the Data Bank on March 20, 1995. Therefore, Methodist argued that Wheeler's claim is barred by the one-year limitations period for defamation claims. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 16.002(a) (Vernon 1999). As proof, Methodist submitted a copy of the Report that indicates it was made to the Board of Medical Examiners on March 20, 1995, and was processed by the Data Bank on April 19, 1995.

To negate the discovery rule, Methodist argued that Wheeler knew of the Report as early as March 24, 1995, the date Methodist sent him the letter that accepted his voluntary resignation and noted that Methodist would list Wheeler's status as "suspended" and would, "as required, . . . report this action to the National Practitioner Data Bank through the Texas State Board of Medical Examiners." It is undisputed that Wheeler did not respond in any way to this written notice.

In addition to evidence of the March 24, 1995 letter, Methodist provided the trial court with Wheeler's deposition testimony. Wheeler admitted he was notified of the

assessed for misuse of Data Bank information released by unauthorized means. *See* 45 C.F.R. § 60.13(a),(b) (West 2000).

Reports to the Data Bank may also be disclosed to an attorney, or an individual representing himself, in a claim for medical malpractice against a hospital or physician. The information in the Data Bank will be disclosed only upon proof that the hospital failed to request the information regarding the physician as required by law, and it may be used solely with respect to the litigation resulting from the action or claim against the hospital. 45 C.F.R. § 60.11(a)(5).

filing of the Report, and that he did not act when he learned about it:

Q: Well, did you—upon receiving that [March 24, 1995 letter], did you call or write to anybody at Methodist and say: What in the world are you talking about?

A: I was too shocked to do anything besides talk to my lawyer.

Q: Well, not necessarily at the moment, but at any time after you received that [letter], did you contact anybody at Methodist and say: What do you mean under investigation or suspended?

A: I was too frightened. No, I did not.

Q: Why were you too frightened?

A: These are extremely strong words.

Q: Well, if you didn't have any understanding that you were under investigation or that you'd been suspended, why wouldn't you contact somebody at the hospital to say is there a mistake or what's the basis for saying this or some action to that effect?

A: By the time I got this letter, I became immediately suspect of the entire process through which I had been through; therefore, I didn't think talking to anyone connected with this issue was going to help me. The letter specifically says if I have an y questions. I had no questions. The letter is very clear.

Methodist also presented evidence that Wheeler received two separate letters from CIGNA Healthcare inquiring about the Report. Wheeler had submitted a credentialing application to become a healthcare provider for CIGNA Healthcare. In October 1995, CIGNA sent its first letter notifying Wheeler of the Report. On December 14, 1995, CIGNA sent its second letter requesting that Wheeler provide an explanation of the Report. Wheeler still took no action regarding the Report until October 1996, when he finally requested a copy of it. He testified about the letters from CIGNA as follows:

Q: Now, if you got this [second] notice in December '95 from CIGNA that such a data bank inquiry—record existed, I mean why did you wait until October of '96 to ask for it?

A: I specifically did not know at that time that I as an individual had access to that. So that's ignorance on my part. And I was also basically fearful and recoiling from the CIGNA letter as to, you know, was there anything I could do besides just hole up and hide.

Methodist argued that this evidence established, as a matter of law, that Wheeler knew of the existence of the Report on March 24, 1995, and he did not exercise due diligence in discovering its contents.

### 4. Wheeler's controverting evidence

Wheeler argued his defamation cause of action accrued on two possible dates: (1) December 14, 1995, when he first learned from CIGNA Health Care that the Report was causing him a problem; and (2) October 8, 1996, when he requested a copy of the Report from the Data Bank. He also presented deposition testimony of at least five other physicians who did not know how to request information from the Data Bank, arguing that his ignorance of the Data Bank's procedures was justified. Thus, his argument is that, while he knew the Report existed as early as March 1995, he did not know its contents until much later, and that is when the statute of limitations should commence.

Wheeler argues that he did not make any inquiries into the Report after receiving the March 24, 1995 letter because (1) he was too scared to inquire, and (2) he did not know how to get the information from

the Data Bank. Neither of these reasons satisfies the requirement that Wheeler exercise reasonable diligence in trying to discover his cause of action.

With the evidence presented, we conclude that reasonable minds could not differ about the conclusion to be drawn from the facts in the record—Wheeler knew about Methodist's Report to the Data Bank on March 24, 1995, and he did nothing to determine its contents. Even if Wheeler (and other physicians) did not know how to obtain information from the Data Bank, he did not show that he even tried to obtain any information. Instead, he chose to ignore it, or as he stated, "hole up and hide."

We hold that the limitations period on Methodist's initial reporting began to run on March 24, 1995. Thus, because Wheeler did not file this lawsuit until more than one year after this date, the statute of limitations bars his defamation claim to the extent that it is based solely on this initial disclosure.

### 5. Republication of the Report by the Data Bank

██ Wheeler further argues that Methodist is liable for defamation resulting from the Data Bank's republications of Methodist's Report. Pursuant to the "Disclosure History" section of the Report, it was released by the Data Bank on November 14, 1995 and August 6, 1996, both within one year of November 13, 1996, the date Wheeler filed suit against Methodist. Wheeler testified that he lost an association with CIGNA and patients, and several Methodist physicians testified in their depositions that loss of their privileges at Methodist would affect them financially.

In a factually similar appeal involving republication by the Data Bank, the medical center argued that the doctor's defamation claim was barred by the statute of limitations. *See Stephan v. Baylor Med. Ctr.*, 20 S.W.3d 880, 888 (Tex.App.-Dallas 2000, no pet.). Conversely, the doctor argued that because the hospital's report continued to be disseminated by the Data Bank, a new cause of action, together with a new limitations period, arose each time the Data Bank transmitted the report. *Id.*

The *Stephan* court agreed with the doctor, concluding that "[a] physician may suffer a new and distinct injury with each republication of an allegedly defamatory report by the [Data Bank]" and that, "[a]ccordingly, each transmission of the report is a new publication and a possible separate tort." *Id.* at 889. The court noted that, in cases of alleged libel in mass media communications, the plaintiff's cause of action generally accrues on the last day of the mass distribution of the printed defamatory statement, rather than on the dates of the secondary distributions or retail sales of the printed matter. *Id.; see also Williamson v. New Times, Inc.*, 980 S.W.2d 706, 710 (Tex.App.-Fort Worth 1998, no pet.) (discussing single publication rule); *Holloway v. Butler*, 662 S.W.2d 688, 692 (Tex.App.-Houston [14th Dist.] 1983, writ ref'd n.r.e.) (same). Nevertheless, the court analogized the confidential and restricted dissemination of a Data Bank report to credit reports, which the United States Court of Appeals, Fifth Circuit, has found can create a new cause of action with each transmission of a credit report to a new audience. *Stephan*, 20 S.W.3d at 889 (discussing *Hyde v. Hibernia Nat'l Bank*, 861 F.2d 446, 450 (5th Cir.1988)).

██ Although a party is generally not liable for a republication of a defamatory statement by another, "[i]f a reasonable person would recognize that an act creates an unreasonable risk that the defamatory matter will be communicated to a third party, the conduct becomes a negligent communication, which amounts to a publi-

cation just as effectively as an intentional communication." *Marshall*, 859 S.W.2d at 396; *see also* Restatement (Second) of Torts § 577, cmt. k (1977). We conclude that the Data Bank's republications of Methodist's Report constitute discrete, actionable events for limitations purposes. Because the Data Bank's republications occurred within one year from the date when Wheeler filed suit, his defamation claim is not barred by limitations to the extent that it is based on those republications. We sustain Wheeler's fourth issue.

**B. Issues one, two, three, five, and six—Whether Wheeler was precluded from challenging Methodist's summary judgment motion because of the erroneous denial of discovery**

In its summary judgment motion and on appeal, Methodist argues it was entitled to summary judgment as a matter of law, because it is immune from civil liability under state law and Wheeler has not established a prima facie showing that Methodist acted with malice or actual knowledge of falsity when it issued the report.

In his first three interrelated issues, Wheeler argues the trial court abused its discretion in disallowing his discovery requests because the requested discovery (1) was not privileged, (2) was necessary to Wheeler to provide an adequate response to Methodist's summary judgment motion, and (3) was necessary to provide a complete record for this Court on appeal. In his fifth issue, Wheeler asserts the trial court erred in overruling his objections to Methodist's summary judgment evidence because Wheeler was entitled to the discovery requests that the trial court denied. In his sixth issue, Wheeler asserts the trial court erred in granting Methodist's summary judgment motion because he raised a genuine issue of fact regarding whether Methodist acted with malice or, alterna-

tively, he was prevented from doing so because the trial court erroneously denied his discovery requests.

Wheeler's discovery arguments in issues one, two, three, five and six turn on two underlying issues—(1) whether the trial court abused its discretion by denying Wheeler discovery to which he was entitled and (2) whether Wheeler was precluded from challenging Methodist's qualified immunity because the discovery requests were denied.

**1. Methodist's peer review immunity and privilege**

To address these issues, we consider the following law governing Methodist's assertion of peer review privilege and immunity.

**a. Immunity for peer review activity**

State and federal law requires hospitals to report the results of peer review actions, including the acceptance of the surrender of privileges, to a state medical review board (which in turn reports the information to the Data Bank). *See* TEX. REV. CIV. STAT. ANN. art. 4495b (repealed 1999), § 5.06(b); 42 U.S.C.A. § 11133(a)(1). State law (the TMPA) provides immunity from liability for a hospital's peer review activity or peer review report as follows:

(*l*) A cause of action does not accrue against the members, agents, or employees of a medical peer review committee or against the health-care entity from any act, statement, determination or recommendation made, or act reported, *without malice*, in the course of peer review as defined by this Act.

(m) A person, health-care entity, or medical peer review committee, that, *without malice*, participates in medical peer review activity or furnishes records, information, or as-

sistance to a medical peer review committee or the board is immune from any civil liability arising from such an act.

TEX. REV. CIV. STAT. ANN. art. 4495b, § 5.06(*l*), (m) (emphasis added).

The Texas Supreme Court has held that, for claims against a hospital falling within the ambit of the TMPA, the TMPA's "immunity provisions prescribe a threshold standard of malice to state a cause of action," a requirement that "does not violate the Open Courts Provision of the Texas Constitution." *Agbor,* 952 S.W.2d at 509.[7] *Agbor* relied upon the definition of malice set forth in section 41.001(7) of the Texas Civil Practice and Remedies Code.

(A) a specific intent by the defendant to cause substantial injury to the claimant; or

(B) an act or omission:

 (i) which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

 (ii) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

*Agbor,* 952 S.W.2d at 506 (quoting from TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(7) (Vernon 1997)).

Thus, the TMPA requires a plaintiff suing a defendant for covered activities to make the threshold showing that the defendant acted (1) with the specific intent to harm the plaintiff or (2) with actual awareness of an extreme degree of risk as well as conscious indifference to the welfare of others.

Under federal law (the HCQIA), a hospital that reports information regarding peer review is similarly immune from liability for that report if it provides the information without knowledge of its falsity. *See* 42 U.S.C.A. § 11137(c); *Davis v. Methodist Hosp.,* 997 S.W.2d 788, 794 (Tex.App.-Houston [1st Dist.] 1999, pet. denied).

When, as here, a defendant files a summary judgment motion based in part on ·the plaintiff's failure to provide evidence of malice under the TMPA, the burden shifts to the plaintiff to produce proper summary judgment evidence raising a genuine issue of material fact on the existence of malice. *See* TEX. R. CIV. P. 166a(i); *Denton,* 998 S.W.2d at 298–99 (determining that plaintiff failed to establish malice under TMPA in response to defendant's no-evidence summary judgment motion). Thus, Methodist is entitled to immunity under state law if it did not act with malice.[8]

---

**7.** *Agbor* involved a patient's cause of action against a hospital for its credentialing activities. Nevertheless, the decision's reasoning was worded in language that applies more generally to other suits affected by the TMPA. *See* 952 S.W.2d at 509 (discussing TMPA's provision for hospital immunity).

**8.** This seemingly harsh result, curtailing a doctor's rights against the hospital that reports on him, occurs because the hospital is required to do so under state law. As the legislature has explained its purpose in enacting the TMPA:

The practice of medicine is a privilege and not a natural right of individuals and as a matter of policy it is considered necessary to protect the public interest through the specific formulation of this Act to regulate the granting of that privilege and its subsequent use and control.

TEX. REV. CIV. STAT. ANN. art. 4495b, § 1.02(1), (repealed 1999). The legislative debate focused in part on providing immunity for participants in peer review committees from retaliatory claims filed by disciplined doctors. During the legislative discussion of

### b. Peer review discovery privilege

Section 5.06(s)(3) of the TMPA provides hospitals with a broad privilege against discovery of the peer review process:

> In no event may . . . reports and records received, maintained, or developed by the board, by a medical peer review committee, . . . or by a health-care entity be available for discovery or court subpoena or introduced into evidence in a medical professional liability suit arising out of the provision of or failure to provide medical or health-care services, or in any other action for damages.

TEX. REV. CIV. STAT. ANN. art. 4495b, § 5.06(s)(3) (repealed 1999). The TMPA also provides generally that all proceedings and records of a medical peer review committee are confidential, and all communications made to a medical peer review committee are privileged. TEX. REV. CIV. STAT. ANN. art. 4495b § 5.06(g) (repealed 1999). This information is not admissible in a civil judicial or administrative proceeding without written waiver.

TEX. REV. CIV. STAT. ANN. art. 4495b §§ 5.06(j), (s)(3) (repealed 1999).[9]

### 2. Whether Wheeler raised a fact question regarding malice under the existing record

Methodist is entitled to immunity for its peer review activity and the Report to the Data Bank if it acted without malice. Using *Agbor's* definition of malice, the question before us is whether Wheeler raised a fact question that Methodist (1) issued a false peer review report with the specific intent to harm Wheeler or (2) acted with actual awareness of an extreme degree of risk of harm to Wheeler, as well as conscious indifference to his welfare.

However, the truth or falsity of Methodist's Report turns on whether Methodist suspended Wheeler because it *concluded* that he did not adhere to the terms of the PIP, not whether Wheeler *actually had problems* in his performance warranting the PIP or *actually failed to adhere* to the PIP's terms. *See Davis*, 997 S.W.2d at 794 n. 3 (noting that truthfulness of adverse action report turned on whether hos-

---

the bill, Senator Chet Brooks described the Act's provision for immunity in the absence of malice as a compensation to health care providers and peer review boards for their statutorily imposed duty to report problems with physicians to the Board of Medical Examiners:

> We want the health care facilities that take adverse action against a physician's privileges to practice at that facility—to report that action to the Board of Medical Examiners so that the Board of Medical Examiners will have at least an alert there that they need to check into this and see what the basis for the removal of those privileges would be, and whether or not there ought to be some board follow-up on it. We also mandate peer review committees to report their findings that have to do with questionable practices to the board. And we also mandate physicians to report what they consider to be a threat to the patients and to the practice of medicine. Now to get this mandatory reporting we have also ac-

companied it in an even-handed way, with a liability shield—that as long as those reports are made in good faith and without malice or some illegal intent, that there would be no liability against them.

Debate on Tex. S.B. 171 on the Floor of the Senate, 70th Leg. (April 24, 1987) (tape available from Senate Staff Services Office) (quoted in *Agbor*, 952 S.W.2d at 512 (Phillips, C.J., dissenting)). Thus, the Act's provision of immunity in the absence of malice is simply a safe harbor created to protect physicians and hospitals from liability for their statutorily imposed duty to report adverse action against physicians. Their qualified immunity reflects that the decision whether to report problems with physicians is no longer discretionary under Texas law.

9. The provisions discussed above are now contained (without substantive change) in TEX. OCC. CODE ANN. §§ 160.001–07 (Vernon 2000).

pital concluded plaintiff was "incompetent, negligent, or guilty of malpractice," not whether he merited the conclusion).

 Wheeler contends the affidavit evidence in the record presently before us shows that Methodist issued a false report with malice. Specifically, Wheeler asserts that his testimony and that of other doctors at Methodist established that:

1. a summary suspension would be warranted only for more egregious offenses than that for which Wheeler was suspended;

2. releasing a patient after a successful procedure was not a matter that required another doctor's permission under the PIP;

3. the same doctor who testified that he decided Wheeler should be suspended later approved Wheeler's credentials at St. Luke's Episcopal Hospital;

4. Methodist (according to Wheeler's affidavit testimony) did not follow the requirements of its bylaws;

5. a history of antagonism and conflict had developed between Wheeler and those who ordered his suspension;

6. the doctors who ordered his suspension did not review his case or seek information regarding his case;

7. other doctors (according to Wheeler's affidavit) made negative comments about Wheeler that were collateral to any real concerns about patient safety (and, in particular, remarked on Wheeler's "attitude"); and

8. at least one doctor discussed Wheeler's purported arrogance.

Wheeler asserts that a federal case has similar factors to those listed above and concludes the hospital acted with malice. *See Rea v. Hospital Corp. of Am.*, 892 F.Supp. 821, 829–30 (N.D.Tex.1993), *rev'd in part*, 95 F.3d 383 (5th Cir.1996). Methodist replies that the doctors Wheeler cites each testified during discovery that Methodist's actions were taken in the course of peer review, and without malice or ill will towards Wheeler. Methodist also contends that Wheeler was suspended for a variety of concerns, not simply for the discharge of a patient without approval, the isolated event on which Wheeler primarily focuses on appeal.

 Malice under the TMPA is a question of purely state law, and much of our TMPA case law developed after *Rea*. Assuming Wheeler's characterization of the evidence is accurate, it does not show Methodist suspended him for reasons other than its conclusion that he had not conformed to the PIP.[10]

We find that Wheeler failed to raise a genuine issue of material fact regarding whether Methodist acted with malice.

**3. Whether the trial court erred in denying Wheeler's discovery requests**

Wheeler argues in his sixth issue that, even if the record before us does not raise an issue of fact as to Methodist's malice, the trial court abused its discretion by denying him discovery that would have allowed him to raise a genuine issue of material fact regarding whether Methodist acted with malice.

**a. Standard of review governing denial of discovery requests**

 We review a trial court's ruling on discovery requests for abuse of discretion.

10. Without a complete copy of the PIP or the written recommendation and final conclusions of Wheeler's peer review committee, we cannot ascertain with certainty what, if any-thing, was false and issued with malice in the Methodist Report. This is the basis for some of Wheeler's other issues discussed below.

See *General Tire, Inc. v. Kepple,* 970 S.W.2d 520, 526 (Tex.1998). A trial court abuses its discretion when it makes a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law. *Walker v. Packer,* 827 S.W.2d 833, 839 (Tex.1992). We may not substitute our judgment for that of the trial court when the decision turns on the resolution of fact issues. *Id.* at 840. However, our review is less deferential as to legal principles; a trial court's failure to analyze or apply the law correctly constitutes an abuse of discretion. *Id.*

 The trial court's discovery decision is an abuse of discretion when:

1. the appellate court would not be able to cure the trial court's discovery error, such as when privileged information or trade secrets would be revealed or a disproportionate burden would be imposed on the producing party to furnish patently irrelevant or duplicative documents;

2. the party's ability to present a viable claim or defense is compromised or vitiated by the erroneous discovery ruling to the extent that it is effectively denied the ability to develop the merits of its case; or

3. the trial court's discovery order disallows discovery which cannot be made a part of the appellate record, thereby denying the reviewing court the ability to evaluate the effect of the trial court's error.

*In re Colonial Pipeline Co.,* 968 S.W.2d 938, 941 (Tex.1998).

Here, the party claiming discovery privileges, Methodist, had the burden to prove that the discovery Wheeler sought was privileged. *See In re The Methodist Hospital,* 982 S.W.2d 112, 114 (Tex. App.-Houston [1st Dist.] 1998, no pet.). We must determine whether Methodist submitted sufficient evidence to establish the privileges. *See id.*

#### b. The medical peer review privilege and its exceptions

##### (1) The statutory provisions for immunity

All proceedings and records of a medical peer review committee ("the MPRC") are confidential, and all communications made to the MPRC are privileged. TEX. REV. CIV. STAT. ANN. art. 4495b § 5.06(g) (repealed 1999). This information is not subject to subpoena or discovery and is not admissible in a civil judicial or administrative proceeding without written waiver. *Id.* §§ 5.06(j), (s)(3) (repealed 1999).

##### (2) Exceptions to the medical peer review privilege

 In *Irving Healthcare System v. Brooks,* the Texas Supreme Court set out the parameters of this privilege and its exceptions for claims of libel and slander against a medical center. *See* 927 S.W.2d 12, 19–24 (Tex.1996). Statutory confidentiality provisions do not prevent discovery from alternative sources—*e.g.,* documents provided to the MPRC that are shared with individuals "that do not come under the umbrella of article 4495b," documents obtained by the committee that are within the public domain, or routine business records that the committee has reviewed or considered. *Id.* at 18. In other words, records or documents are not privileged simply because the MPRC has reviewed them.

 The MPRC can be the source of document discovery when privilege has been waived, and a hospital or physicians included within the protections of section 5.06 can be the source of document discovery when they possess "the documents in a nonprivileged capacity, such as the custodian of a patient's medical records." *Id.* at 18. Deposition questions about communi-

cations to the MPRC and what it considered are subject to objection as information "included within all proceedings of and all communications made to" the MPRC. *Id.* Thus, on one hand, providing information to the MPRC does not shield and render undiscoverable otherwise discoverable information; on the other hand, a party seeking discovery cannot circumvent the privilege by specifically requesting information furnished to the committee.

A doctor affected by a peer review decision

> is entitled to written copies of any recommendations or final decisions of [a health-care facility]'s medical peer review committees that could result in censure, suspension, restriction, limitation, revocation, or denial of membership or privileges in a health-care entity.

*Id.* at 21(citing section 5.06(i) of the TMPA). Further, the committee's final decision must contain "a statement of the basis for the decision." TEX. REV. CIV. STAT. ANN. art. 4495b, § 5.06(I) (repealed 1999).[12]

■■■■ Finally, physicians seeking to establish malice can obtain copies of documents they furnished to or received from an MPRC. *See Irving Healthcare,* 927 S.W.2d at 21. While "communications to [an MPRC] are privileged from discovery *by third parties* under the statutes, a physician may compel production of *his or her own direct communications* with the committee." *Id.* (emphasis added). However,

the hospital's duty to disclose such information to the doctor does not waive confidentiality as to third parties who also seek to obtain those documents. *See id.*

### (3) Categories of discovery to which Wheeler is entitled

■■■■ Summarizing and applying these rules, we conclude that Methodist's statutory privilege for peer review activities does not bar Wheeler from obtaining the following from Methodist:

**Discovery directed to a non-MPRC source:**

1. documents within the public domain that the MPRC has reviewed or considered (*i.e.,* information available from a source other than an MPRC, such as routine business records or medical records, for which no other privilege applies, in Methodist's possession as custodian of the records);

**Discovery directed specifically to the MPRC:**

2. recommendations or final decisions (including a statement of the basis for the decision) of the MPRC that could result in censure, suspension, restriction, limitation, revocation, or denial of membership or privileges in a health-care entity;

3. communications between Wheeler and the MPRC; and

4. documents that Methodist or the MPRC has waived the privilege by

---

12. Section 5.06(i) provides in its entirety as follows:

> Disclosure of confidential peer review committee information to the affected physician, physician assistant, or acupuncturist pertinent to the matter under review shall not constitute waiver of the confidentiality provisions provided in this Act. If a medical peer review committee takes action that could result in censure, suspension, restriction, limitation, revocation, or denial of

membership or privileges in a health-care entity, the affected physician, physician assistant, or acupuncturist shall be provided a written copy of the recommendation of the medical peer review committee and a copy of the final decision, including a statement of the basis for the decision.

*Id.* The current (and substantively similar) version of section 5.06(i) is found in TEX. OCC. CODE ANN. § 160.007 (Vernon 2000).

sharing with individuals not under the umbrella of article 4495b.

Other than Wheeler's statutory right (under section 5.06 of the TMPA) to copies of recommendations or final decisions reached in the peer review process, and his right (under *Irving Healthcare*) to discovery of his own communications with the MPRC, his discovery requests must be for nonprivileged documents from nonprivileged sources. *See Irving Healthcare,* 927 S.W.2d at 18, 21.

### c. Wheeler's discovery requests

■ The trial court denied each of the 71 discovery requests listed in Wheeler's motion to compel production, and he contests 49 of these rulings on appeal. The blanket ruling denied some discovery requests to which Wheeler was entitled, and compromised his ability to discover evidence of malice, if in fact it existed, and to maintain his claim against Methodist. Furthermore, the trial court refused *in camera* review when it issued the order denying discovery. Because the record has not been preserved for appeal, this ruling denies us the ability to evaluate the effect of the trial court's error. *See Colonial Pipeline Co.,* 968 S.W.2d at 941 (discussing bases for concluding that mandamus relief was justified by the trial court's abuse of discretion). We hold the trial court abused its discretion in denying those discovery requests to which we indicated Wheeler is entitled.[12]

We sustain issues one, two, three, five, and six.

### C. Issue seven

■ Issue seven, in Wheeler's brief, states that the trial court erred in failing to determine that a material fact issue exists as to whether Methodist met the requirement to assert immunity for having made the Report. Wheeler's argument in his brief consists of several pages of quotes from "Methodist's bylaws" followed by one sentence stating that a fact question exists concerning Methodist's compliance with its own bylaws and procedures. Although Wheeler presents more of an argument regarding this issue and cites one case in his reply brief, his brief does not explain how, if at all, these actions affect Methodist's claim of immunity under TMPA. Because Wheeler's brief does little more than summarily state his point of error, without citations to legal authority or substantive analysis, it is not sufficient to acquaint the Court with the issue and does not present an argument that would allow the court to decide the issue. Thus, issue seven, which was first sufficiently briefed only in Wheeler's motion for rehearing, is waived. TEX.R.APP. P. 38.1(h); *See Keever v. Finlan,* 988 S.W.2d 300, 314 (Tex.App.-Dallas 1999, writ dismissed).

■ Even if it was not waived, Wheeler's argument regarding issue seven would fail. Wheeler argues in his motion for rehearing that (1) unless Methodist complied with its bylaws in placing Wheeler under investigation or in summarily suspending him, Methodist had no duty to report and (2) the evidence is undisputed that Methodist failed to comply with its bylaws in conducting its investigation. Therefore, he concludes that Methodist is

---

12. Methodist also argues on appeal that it is entitled to absolute immunity under state common law. This argument fails under these facts because the Report was not issued in the context of a *judicial proceeding. See, e.g., Stephan,* 20 S.W.3d at 890 (determining that a medical center was not entitled to absolute immunity because "the adverse action report was not sent to the Texas Board of Medical Examiners or the [Data Bank] as a part of a judicial or quasi-judicial proceeding").

not entitled to immunity for issuing the report because it had no duty to report.

In relevant part, Section 5.06(b) of the TMPA, requires a peer review committee or health-care entity to report to the Data Bank in writing "the results and circumstances of any professional review action" when

(1) the action adversely affects the clinical privileges of a physician for a period longer than 30 days;

(2) a health care entity accepts the surrender of clinical privileges of a physician while the physician is under an investigation by the medical peer review committee relating to possible incompetence or improper professional conduct; or

(3) a health care entity accepts the surrender of clinical privileges of a physician in return for not conducting such an investigation.

Following his telephone conversation on March 17, 1995 with Drs. Zepeda and Simon, Dr. Wheeler knew his conduct in discharging his patient was to be the basis of an investigation regarding his PIP compliance. Resigning a few hours after he was told either he *would be suspended* when Dr. Simpson returned (as Wheeler testified), or he *was suspended* (as Zepeda and Simon testified), prevented the investigation that had been triggered from proceeding much beyond its initiation. The only reasonable conclusion is that Wheeler's resignation caused Methodist to discontinue its investigation, the grounds requiring a Data Bank report under TMPA Section 5.06(b). The terms of the reporting requirements require reporting resignations that are tendered at the moment of inception of an investigation.

Wheeler cites *Simpkins v. Shalala,* 999 F.Supp. 106 (D.D.C.1998), a District of Columbia district court decision, as authority that a health care entity's failure to comply with its bylaws in conducting a peer review investigation disqualifies the investigation as a matter of law and negates immunity provisions. Upon review of the case, we find that the court in *Simpkins* disqualified the investigation and negated the immunity provisions because the investigation was carried out by an individual who was not acting on behalf of the hospital. *Id.* at 114. The court merely used the hospital's bylaws as an "indicator" of whether the investigation was carried out on behalf of the hospital. *Id.* Thus, in *Simpkins,* it was the hospital's failure to conduct an investigation, and not the hospital's failure to comply with its bylaws, that negated the immunity provision.

■■■■■ Even if Methodist did not follow the bylaws, it did not waive its immunity. Here, the bylaws Wheeler refers to as "Methodist's bylaws" are actually the "Bylaws of the Medical Staff of The Methodist Hospital." Procedural rights created by medical staff bylaws are not necessarily binding on the hospital. *See Stephan v. Baylor Med. Ctr.,* 20 S.W.3d 880, 887 (Tex. App.-Dallas 2000, no writ). The medical staff and the hospital are not one and the same. *Id.* The preamble to Methodist's medical staff bylaws states in part that in discharging its duty to ensure quality medical care, the staff is "subject to the ultimate authority of the Hospital's Board of Directors." The medical staff bylaws do not attempt to define or limit Methodist's powers; rather, their purpose states in part that they present a means whereby the staff may present concerns to the board of directors. Bylaws that reference the hospital board, but do not define or limit the powers of a hospital acting through its governing board, do not create obligations for the hospital. *Id.* Because Methodist has no duty pursuant to its medical staff bylaws, any failure by Methodist to comply with the terms of such

bylaws does not affect its duty to report under the TMPA.

In summary, even if Methodist did not follow its medical staff's bylaws in suspending or investigating Wheeler, Methodist had a duty to report that it took an adverse action within the meaning of the TMPA. Medical Staff bylaws, which are not controlling over the hospital, cannot nullify the TMPA's reporting requirements. We overrule issue seven.

### D. Issues eight and nine

■ In issue eight, Wheeler argues that the statutory and common law privileges on which Methodist relies are unconstitutional. He does not cite case law or provide analysis in support of this contention.[13]

■ Finally, in issue nine, Wheeler asserts that, to the extent the trial court based its summary judgment decision on an alternative or additional ground, there is a material fact issue precluding summary judgment on that issue. Again, he does not cite case law or provide analysis in support of this contention.

We hold that Wheeler waived these issues by not supporting them with argument and authorities. *See* TEX. R. APP. P. 38.1(h); *Trenholm v. Ratcliff*, 646 S.W.2d 927, 934 (Tex.1983).

We overrule issues eight and nine.

### V.

### Conclusion

Because the Data Bank republished Methodist's Report at least twice within the year before Wheeler filed suit, his defamation claim against Methodist is not barred by limitations to the extent that it

is based on those republications. Although the evidence does not show that Wheeler raised an issue of material fact as to whether Methodist acted with malice, the trial court abused its discretion in denying Wheeler discovery that might have enabled him to establish Methodist's malice.

We reverse the trial court's summary judgment and remand for further proceedings consistent with this opinion. Our judgment of December 28, 2000 remains unchanged.

---

13. The Texas Supreme Court has specifically held that the TMPA's immunity provisions' threshold standard of malice for stating a cause of action against a hospital "does not violate the Open Courts Provision of the Texas Constitution." *Agbor*, 952 S.W.2d at 509.