Opinion issued July 23, 2009













     




In The
Court of Appeals
For The
First District of Texas




NO. 01-07-00319-CV




MASTEC NORTH AMERICA, INC. AND MASTEC, INC., Appellants

V.

EL PASO FIELD SERVICES, L.P. AND GULFTERRA SOUTH TEXAS,
L.P. F/K/A EL PASO SOUTH TEXAS, L.P., Appellees





On Appeal from the 334th District Court
Harris County, Texas
Trial Court Cause No. 2004-39579




O P I N I O N

          This is a breach of contract dispute brought by appellants, MasTec North
America, Inc., and Mastec, Inc. (collectively, “MasTec”), against appellees, El Paso
Field Services, L.P. and Gulfterra South Texas, L.P., f/k/a El Paso South Texas, L.P.
(collectively, “El Paso”). El Paso engaged MasTec to replace a butane pipeline for
a lump sum of $3.6 million, known as the “Butane Shuttle Replacement Project”
(“Project”). MasTec submitted its bid on the Project based on information in El
Paso’s bid package, which included, inter alia, the “Station and Land Pipeline
Construction Contract” (“Contract”) and El Paso’s specifications, which were
incorporated into the Contact. In the Contract specifications, El Paso asserted that
it used due diligence in locating any “foreign crossings”


 in the pipeline right-of-way
and that there were 280 such crossings. During construction, however, MasTec
encountered 794 foreign crossings, which required additional construction measures
and increased its costs substantially. MasTec sued El Paso to recoup the additional
expenses. A jury found that El Paso breached the due diligence provision of the
Contract specifications and awarded $4,763,890 in damages to MasTec. 
Subsequently, on the motion of El Paso, the trial court granted judgment
notwithstanding the verdict (“JNOV”) in favor of El Paso, concluding that the lump-sum provisions of the Contract allocated the risk of unidentified foreign crossings to
MasTec and holding that MasTec take nothing by its claims. MasTec appeals.
          In its sole issue, MasTec contends that the trial court erred by granting JNOV
in favor of El Paso because the trial court’s interpretation of the Contract improperly
rendered the due diligence provision a nullity and shifted the risk of costs associated
with unidentified foreign crossings to MasTec. In the alternative, MasTec contends
that (a) the Contract is ambiguous and must be strictly construed against El Paso, or
(b) that MasTec is entitled to recover under its quantum meruit theory.
          We reverse and remand for entry of judgment consistent with the jury’s verdict
and for assessment of attorney’s fees in favor of MasTec.
FACTS AND PROCEDURAL HISTORYEl Paso is one of the world’s largest energy companies. MasTec is a
construction company that was established in the 1930s and that has annual gross
revenue exceeding $1 billion.
          At the time of the events, El Paso owned a butane pipeline that extended from
Houston to Corpus Christi. The pipeline was originally constructed in the 1940s as
an emergency supply line during the war. Because of its age and because it was
deemed too shallow (buried less than 12 inches underground), El Paso contracted for
its replacement, which took place in phases. This lawsuit involves Phase II of the
replacement—a 68-mile, 8-inch diameter line extending from Victoria to Nueces
Bay.



          El Paso invited MasTec to bid on the replacement Project, which was to
include removal of the existing pipeline and the construction of a new pipeline in the
same location. MasTec hired Bill White, who is considered by MasTec to be “a
pipeline-construction veteran,” as its general manager. White attended El Paso’s
“pre-bid meeting” on April 22, 2003, at which El Paso distributed bid packages
containing the job description, the location of the pipeline, drawings or maps, known
as “alignment sheets,” and the Contract. 
          According to El Paso’s bidding instructions, “The Contractor’s bid shall be
based on the Contract documents as issued, without modifications. All clarifications
or changes during the bid period will be communicated to all Contractors. . . .
Significant exceptions to the provisions of the Proposed Contract documents may
cause rejection of the bid. . . . The Scope of Work is believed to be complete.”
          The purpose of the alignment sheets was to show “foreign crossings,” which
are obstacles that cross the pipeline right of way—such as other pipelines, utilities,
roads, rivers, fences, wells, cables, and concrete structures. Substantial costs are
involved in maneuvering around these structures during pipeline construction and de-construction. El Paso had hired Gullett & Associates, an engineering company, to
produce the alignment sheets.
          The invitation to the pre-bid meeting stated, “No guided tour of the proposed
pipeline is now scheduled. Each contractor will be required to review the
construction requirements individually. Aerial inspection is highly recommended.”
At the meeting, Jackie Ross, who was initially a consultant to El Paso and later
became the full-time assistant to the project manager on this Project, told the
contractors that El Paso would normally conduct a tour of the pipeline, but that there
would be too many cars in this case and that each of the contractors was encouraged
to “fly the route.” 
          After the pre-bid meeting, White and his son, Mike, flew by helicopter over the
pipeline route, familiarizing themselves with the topography and landing several
times to check soil conditions. Mike testified by deposition that he carried the
alignment sheets in his lap during the flight for orientation, but that he could not see
foreign crossings from the air. White also drove along portions of the pipeline to
which he had access. According to White, MasTec and the other contractors were
specifically prohibited from entering certain private properties along the route,
including the O’Connor Ranch. El Paso later claimed that the contractors were
permitted to enter the restricted areas for inspection if they arranged for an escort by
an El Paso representative. 
          Pursuant to El Paso’s written bidding instructions, MasTec’s bid and completed
Contract, including lump-sum price schedule, were due 12 business days later, on
May 8, 2003. This date was later amended to May 15, 2003.
The Contract and Specifications
          The Contract, which MasTec was to sign and submit with its bid, provides as
follows, in pertinent part:
          2.1     SCOPE OF WORK
[MasTec] agrees, at its cost, that it shall (except as otherwise provided
for in the Contract or Drawings) furnish all necessary materials,
supplies, labor, tools, equipment superintendence, apparatus and
machinery, including without limitation, transportation and all other
items necessary to perform the Work for the construction and
completion of, and shall construct, install, complete, and deliver to [El
Paso] in a good and workmanlike manner, in strict compliance with the
Contract and all applicable laws, rules, regulations, ordinances and
permits, all of the Work set forth in Exhibit “A,” “Scope of Work and
Addendums” (attached hereto), all in accordance with the provisions of
this Contract. 
          . . . .
          4.1     COMPENSATION
For and in consideration of the performance of the Work by [MasTec]
and subject to the terms and conditions of this Contract, [El Paso] agrees
to pay and [MasTec] agrees to accept compensation as set forth in the
attached Exhibit “B-1,” Contract Price Schedule.
          . . . . 
          4.6     COMPENSATION FOR DELAYS IN PERFORMANCE OF
WORK
          a)       By [MasTec]: All delays in the performance of the Work resulting
from causes other than those attributable to [El Paso] shall be at
the cost and expense of [MasTec]. . . .
          b)      By [El Paso]: For delays in the performance of the Work
attributable to [El Paso], it is agreed that the compensation and/or
amounts due [MasTec] in full and complete settlement of such
delays shall be as follows: [various lump sum settlement or
reimbursement options].
          . . . .
          7.1     REPRESENTATIONS AND WARRANTIES
          . . . . 
          e)       [MasTec represents] [t]hat its duly authorized representative has
visited the site of the Work, is familiar with the local and special
conditions under which the Work is to be performed and has
correlated the on site observations with the requirements of the
Contract and has fully acquainted itself with the site, including
without limitation, the general topography, accessibility, soil
structure, subsurface conditions, obstructions and all other
conditions pertaining to the Work and has made all investigations
essential to a full understanding of the difficulties which may be
encountered in performing the Work, and that anything in this
Contract or in any representations, statements or information
made or furnished by [El Paso] or any of its representatives
notwithstanding, [MasTec] assumes full and complete
responsibility for any such conditions pertaining to the Work, the
site of the Work or its surroundings and all risks in connection
therewith;
          f)       That it possesses a high level of experience and expertise in the
business, administration, construction management and
superintendence of projects of the size, complexity and nature of
the Work and that it will perform the Work with the care, skill
and diligence of such a Contractor;
          g)      That the Contract is sufficiently complete and detailed for
[MasTec] to perform the Work required to produce the results
intended by the Contract and comply with all the requirements of
the Contract; . . . 
          8.1     CONTRACTOR’S CONTROL OF THE WORK
          a)       . . . .
          . . . .
7. [MasTec] represents that it has had an opportunity to
examine, and has carefully examined, all of the Contract
documents and has fully acquainted itself with the Scope
of Work, design, availability of materials, existing
facilities, the general topography, soil structure,
substructure conditions, obstructions, and all other
conditions pertaining to the Work, the site of the Work and
its surroundings; that it has made all investigations
essential to a full understanding of the difficulties which
may be encountered in performing the Work; and that
anything in any of the Contract documents or in any
representations, statements or information made or
furnished by [El Paso] or its representatives
notwithstanding, [Mastec] will regardless of any such
conditions pertaining to the Work, the site of the Work or
its surroundings, complete the Work for the compensation
stated in this Contract, and pursuant to the extent of
[MasTec’s] liability under this Contract, assume full and
complete responsibility for any such conditions pertaining
to the Work, the site of the Work or its surroundings, and
all risks in connection therewith. In addition thereto,
[MasTec] represents that it is fully qualified to do the work
in accordance with the terms of this Contract within the
time specified.
          . . . .
          24.1   EXHIBITS
The following Exhibits are included herein by reference, are
attached hereto and shall become a part of this Contract for all
purposes:
                    . . . . 
                    Exhibit “B-1”        Contract Price Schedule
                    . . . . 
                    Exhibit “C”            Construction Specifications
           . . . .
          25.1   ORDER
                    . . . . 
                    b)      . . . The Specifications, Drawings, Exhibits, and all
supplemental documents are essential parts of the Contract,
and a requirement appearing in one is as binding as though
appearing in all. They are intended to be complementary,
to describe and provide a complete Work.
          . . . . 
          28.1   AGREEMENT
This Contract, together with all Exhibits and attachments,
constitutes the entire Contract agreement between the parties
relating to its subject matter and no other conversations, bid,
memoranda or other matter between the parties relating to the
subject matter of this Contract, oral or written, exchanged before
execution of this Contract shall vary, alter or be used to interpret
the terms of this Contract.
 
          Pursuant to Exhibit B-1 of the Contract, “Contractor’s Proposal,” MasTec
agreed to perform “everything necessary to complete, satisfy, and discharge all Work
and obligations imposed on [MasTec] connected with the performance of the Work,”
including, as follows:
Furnish all labor, equipment and materials as described in the
Specifications for all Work necessary to perform the following
applicable Work as shown on the Drawings, including but not limited
to: loading, hauling, unloading, storing, clearing, excavating, including
rock if encountered, cutting and beveling of pipe; installing pipe or
valves, where required; removing pipe or valves, where required;
welding (including tie-in and transition welds, if required); coating,
repairing coating, furnishing and installing padding when applicable;
installing concrete supports; blow-offs, bypasses, bolting, bracing
hydrostatic testing of completed assemblies, painting of newly installed
piping assemblies and cleanup.
          . . . .
Any Work required to complete installation of the new pipeline but not
shown as a pay item is no less included in the scope of work for
installation of the new 8-inch Butane Shuttle pipeline and is included in
[MasTec’s] lump sum proposal. Just because an item of Work is not
specifically identified, does not mean such Work is not included in
[MasTec’s] scope of Work. Any item of Work [MasTec] knows is
required for completion of the installation but not specifically identified
is to be included in [MasTec’s] Lump Sum Proposal.Exhibit C of the Contract provided the “Construction Specifications.” At
Specification LP-1, “General Conditions,” the Contract provides that, “Unless
otherwise specified, [El Paso] will furnish only basic reference lines and bench marks
from which [MasTec] shall establish such other points as it may need.” Specification
LP-5, specified, in relevant part, that El Paso “will have exercised due diligence” in
locating foreign crossings and that MasTec “shall confirm” the location of the
crossings during construction before actually digging or drilling, as follows:

2.COMPANY FOREIGN LINE AND UTILITY CROSSINGS

The Company will have exercised due diligence in locating foreign
pipelines and utility line crossings. However, the contractor shall
confirm the location of all such crossings and notify the owner prior to
any ditching activity in the vicinity of the crossings. . . .

          Specification LP-17, provides the same, as follows:

          2.       FOREIGN LINE AND UTILITY CROSSINGS

The Company will have exercised due diligence in locating foreign
pipelines and/or utility line crossings. However, the Contractor shall
confirm the location of all such crossings and notify the owner prior to
any HDD


 activity in the vicinity of the crossings. Contractor shall be
responsible for all damages to foreign pipelines and/or utility line
crossings during HDD operations. Contractor shall repair damaged
foreign pipelines and/or utility line crossings to original or better
condition and meet Company approval. In all cases, foreign pipelines,
utility line crossings and/or structures take precedence over Company
tolerances. The Bid 

          White, on behalf of MasTec, submitted a completed Contract, per El Paso’s
bidding instructions, and a bid of $3,619,960, which included the removal of the old
pipeline and construction of the new pipeline. White included a standard 15 percent
contingency in the bid for unidentified foreign crossings.

 

          After El Paso reviewed the bids submitted by the various contractors and
narrowed its choices to MasTec and one other contractor, El Paso called a meeting
with White. According to White, he and El Paso went over scheduling, manpower,
equipment, and projected production rates to ensure compliance with El Paso’s
timeframe.


 According to Ross, he and other representatives from El Paso discussed
with White that MasTec’s bid was substantially lower than the bids submitted by
other contractors and that MasTec would be permitted to withdraw its bid if it so
chose. White disputes that he was ever told that MasTec’s bid was low or that
MasTec was being given the choice to withdraw. Ultimately, El Paso accepted
MasTec’s bid.

The Contract is Executed and Work Begins

          Work on the Project was to commence June 9, 2003 and to be completed on
October 1, 2003. Commencement was delayed because El Paso had permitting issues
and had not yet finalized the purchase of work space along the right-of-way from
some of the landowners. Nevertheless, work began in the early part of June. 

 
 
The Dispute

          It is undisputed that, after construction began, MasTec was required to confirm
the exact locations of the foreign crossings that El Paso had identified to avoid cutting
through the crossings. MasTec began to encounter numerous foreign pipeline
crossings that were not on El Paso’s alignment sheets. MasTec hired Steve Edwards
to locate the foreign crossings.

          Edwards testified by deposition read to the jury that foreign pipeline crossings
represent a significant safety hazard during pipeline construction. Each crossing must
be treated as a “live” line, that is, “something that is going to explode if you hit it.” 
Edwards employed a metal detector device, known as an “M-scope,” to find the
foreign crossings. Edwards explained that the M-scope is designed to locate metal
pipelines, as well as PVC and fiberglass pipelines that contain metal tracers. The M-scope is not designed to locate pipelines that do not contain metal or metal tracers. 
To find PVC and fiberglass pipelines, Edwards talked with adjacent landowners and
pipeline operators; used a crew of up to 20 men to probe the ground with metal rods
and shovels, and to dig trenches five feet deep; used hydraulic vacuums to pressure
wash the holes; and marked the pipelines with stakes and red tape. Edwards said that
he located an “extreme amount” of non-metal foreign crossings and that MasTec was
forced to hire an additional M-scope crew to keep up with the pipeline strippers. 

          Edwards testified that it was not unusual to find five to ten percent more
foreign crossings than those identified on the alignment sheets by the pipeline owner. 
In this case, however, he found “approximately 1000” foreign crossings that were not
on El Paso’s alignment sheets. Most of the unidentified foreign crossings were
located on the O’Connor Ranch. Edwards said that El Paso had refused to assist them
in locating the lines.

          Greg Floerke, senior vice president of MasTec’s Communications Group,
explained that each time MasTec found a new foreign crossing, it slowed production
down and efficiency was lost. MasTec had to stop the assembly line to excavate,
remove soil from around the crossing, lay the pipe, make special bends, and weld
each end. Edwards explained that, because of the close proximity of the other El Paso
pipeline and the Valero pipeline in the same right-of-way, each of these “tie-ins” that
were created to go around the foreign crossing required that special OSHA-approved 
manholes be created so that a welder could safely go down and perform the welds. 
In addition, cutting crews and X-ray crews had to go down in the holes. Further,
there was a lot of sink water that had to be pumped out.

          According to Edwards, the situation was exacerbated by the fact that, during
construction, the area was hit with two hurricanes and 50 to 60 inches of rain that
flooded the area, filled the pipeline ditches with silt, and knocked out all of
Edwards’s stakes marking the previously unidentified plastic and fiberglass crossings. 
Edwards explained that, had El Paso’s alignment sheets been accurate, the crews
could have followed the sheets, walked back to the crossings, and resumed work once
the weather stopped. Instead, Edwards was forced to re-survey and re-stake the
foreign crossings in the right-of way. Edwards said that the crews spent days digging
fruitlessly looking for lines.

          Ultimately, according to Edwards, it was a representative from Valero who
offered the most assistance. El Paso had sold to Valero a 12-inch pipeline that laid
in the same corridor and ran parallel to the pipeline at issue in the instant suit. 
Edwards testified that Valero’s alignment sheets contained many of the plastic and
fiberglass crossings that he was finding. 

          According to Edwards, of those foreign crossings that Gullett had staked,
several were mis-marked, were 20 to 30 feet off their exact locations, and had to be
relocated. Edwards testified that, ultimately, Gullett came out to the site and followed
behind Edwards, recording the foreign pipeline crossings that Edwards and his crews
had located. 

          Greg Perkins, a mechanical engineer testifying as an expert for MasTec, said
that he found quite a disparity between El Paso’s for-bid drawings and the as-built
drawings. Perkins said that the Contract required El Paso to use due diligence in
locating the foreign crossings; that MasTec depended on El Paso’s statement of the
foreign crossings; and that the level of El Paso’s inaccuracy “was catastrophic.” With
all of the other pipelines in the same route as the subject pipeline, El Paso “should
have had a better handle on the number of foreign crossings that were actually there.” 
Perkins explained that El Paso could have contacted landowners and operating
companies. Perkins testified that MasTec located 794 foreign crossings and that over
200 of those crossings were actually metal pipelines that had not been identified on
El Paso’s alignment sheets. 

          John Reitzell, assistant project manager for MasTec, took over the Project after
White was let go on November 19, 2003. Reitzell testified that the crews were having
to pressure wash to find the lines and that Valero’s drawings of the foreign crossings
over its parallel pipeline were much more accurate and included the plastic lines. 
According to Reitzell, it took a crew about 10 hours to perform a single tie-in. 
Reitzell testified that MasTec could have accepted a variance of five percent on the 
foreign crossings, but that there were three times as many foreign crossings as
indicated on El Paso’s alignment sheets. In addition, Reitzell explained that the “take
up” crew that worked to pull up the old pipeline found it located at depths of six to
seven feet underground. According to Reitzell, El Paso had told MasTec that the
pipeline was buried no more than 12 inches in the ground. 

          With regard to the duties under the Contract, Floerke testified that the Contract
placed the responsibility on El Paso to apply due diligence in locating and correctly
identifying foreign crossings and that MasTec’s responsibility was to verify those
crossings before digging. Floerke testified that the issue is timing. First, El Paso’s
duty to use due diligence in determining the extent and location of foreign pipelines
arose. Then, after the bid was awarded, the contract was complete, and the crews
were out in the field constructing the line, MasTec’s duty arose to verify the foreign
crossings before actual excavation.

          Danny Dial, a forensic engineer testifying for MasTec, explained that “due
diligence,” in the present context, means that the operating company is telling the
pipeline contractor that they have been diligent in locating all the foreign crossings
and will provide the information to the contractor. Dial testified that the industry
custom or practice is that, before soliciting bids for pipeline construction, operating
companies (1) gather any “one-call”


 information in their catalog; (2) send out a
survey crew; (3) and send their landmen to talk with the landowners from whom the
company obtained its right-of-way easements because the landowners are the best
source of information regarding any other easements that have been granted to other
pipeline operators in the same area.

          Dial explained that, because there was an existing Valero pipeline in the same
right-of-way


 and parallel to the subject pipeline, “it would have been prudent for El
Paso to contact Valero and compare as-built drawings to see if they were aware of
other foreign crossings in that area.” 

          Dial explained that when a lump-sum agreement is made between an operating
company and a contractor, the contractor is necessarily placing a tremendous amount
of trust in the specifications that the operating company submits to the contractor for
the bid. The contractor cannot see what is physically underground and has to rely on 
information given by the operator. Here, El Paso specifically placed in the Contract
assurances that it had exercised due diligence in locating any foreign crossings. El
Paso owns the line, controls the easement, and has access to what crosses through the
area. 

          Ross, of El Paso, testified that El Paso hired the survey company, Gullett &
Associates, to survey the line, to use metal detectors, and to “try to locate any pipeline
that they can, anything visible,” such as line markers. Ross testified that El Paso had
the preliminary alignment sheets that were created in the 1940s for the pipeline at
issue, but that he could not recall having seen any as-built alignment sheets. Ross
testified that the alignment sheets came from the operating company, Coastal, from
whom El Paso had purchased the pipeline, that the sheets “were very poor,” “very
inadequate,” and would not have shown any of the crossings that were installed after
the 1940s. Ross said that he did not believe that the alignment sheets were ever
updated. When asked if he had seen the alignment sheets for Valero’s line, Ross
replied that he did not recall having had access to them. Ross testified that he did not
instruct Gullett to attempt to locate or mark any PVC or fiberglass lines unless such
lines could be seen “by something visual.” Ross further stated that he did not inquire
as to whether El Paso had any “one call” information cataloged and did not attempt
to contact any of the landowners or other operating companies along the pipeline
route. Ross asserted that El Paso “was to perform due diligence to the best they were
available [sic] and that’s what [it] did.”

          Richard Schubert, survey supervisor for Gullett, testified that his scope of work
on the Project was to “collect all data that was pertinent to mapping the pipeline,
whether above ground facilities, an oil well, . . . a below ground structure, a pipeline.” 
Schubert testified that he was asked to locate all the foreign crossings that he could
locate “strictly with the M-scope.” Schubert testified that he did not attempt to find
any PVC or fiberglass lines because it was not part of El Paso’s instructions. At the
close of the Project, El Paso sent Schubert back out to confirm the number and
locations of the additional foreign crossings that MasTec had reported to El Paso. 
Schubert testified that he recorded the GPS location of each foreign crossing. 
Schubert stated that he also recorded every tie-in because each of the welds must be
reported to the Texas Department of Transportation. Schubert testified that there
were 274 additional foreign crossings and 126 additional tie-ins. During Schubert’s
testimony, it was discussed that the alignment sheets Gullett prepared for El Paso to
give to the contractors for bidding purposes showed 282 foreign crossings and the as-built drawings Gullett prepared after MasTec completed the Project showed 343
additional foreign crossings—208 of which were metal.

          According to Mastec, there were 794 foreign crossings, which required a total
of 217 additional tie-ins. The Project was complete in December 2003. 

Communications Concerning the Foreign Crossings 

          During construction, in a letter to White from Mark Bounds, Director of
Onshore Engineering for El Paso Field Services, dated September 5, 2003, Bounds
wrote to confirm that the Project was on track for completion by October 1, 2003, and
to confirm that “as of September 1, 2003, there were [sic] no outstanding extra work
issues or claims for additional compensation that had not been addressed by EPFS [El
Paso Field Services] to MasTec’s full satisfaction” and to confirm that “all extra work
performed prior to September 1, 2003 has been addressed to MasTec’s full
satisfaction and included in payments to Contractor authorized to date.” 

          White responded to Bounds, in a letter dated September 8, 2003, 

I would like to take this opportunity to bring to your attention some
issues that I feel justify discussion for extra compensation to MasTec for
costs not covered by the Contract. This letter does not represent any
demand by MasTec for payment for extra cost issues at this time. We
merely are asking that you take into consideration and review our
position related to additional costs beyond our control.

          . . . . 

Please review the following issues that I feel should be entitled to some
compensation, for our cost overrun. Keep in mind that MasTec does not
feel that EPFS misrepresented any information intentionally, or withheld
any information pertinent to bidding this project. We merely feel that
circumstances beyond your control, and ours, has had a cost impact to
MasTec worth reviewing.

          . . . .

          2)      Pipeline Crossing (Foreign Pipelines) O’Connor Ranch

From [point-to-point] there are approximately 87 pipeline
crossings, indicated on the line sheets. During the bidding
process, we allowed for a 15% increase in the estimated line
crossings to arrive at a cost amount. The final outcome is there
are approximately 450-500 pipeline crossings in this area. (We
will have documentation with accurate numbers in a few days.) 
These were mostly all fiberglass lines that no one had any
knowledge of. There is a great deal of extra cost associated with 
ditching and tie-ins . . . . 

 
          White testified by deposition at trial that he had not submitted change orders
on the additional foreign pipeline crossings because the “problems were still ongoing
and we couldn’t arrive at a cost” yet. White testified that he had had daily
conversations with El Paso because El Paso was concerned, with all of the flooding,
about the penalties El Paso faced with a third party if the completion deadline was not
met. 

          In a letter to White from Bounds, dated September 26, 2003, Bounds responded
that it was El Paso’s position that the issues White stated were within MasTec’s scope
of work. Specifically, with regard to the foreign crossings, Bounds stated, 

The fact was well documented that in the project alignment sheets
provided to MasTec that [El Paso’s] 8-inch Butane Shuttle pipe
replacement project was to traverse numerous active and inactive oil and
gas producing fields along its entire length. Also, [the specifications]
state that [El Paso] will exercise due diligence in locating foreign
pipeline crossings but it is [MasTec’s] responsibility to confirm all such
crossings and contact the owner therof prior to any excavation. In
effect, [El Paso] contracted with [MasTec] to provide this service as part
of the pipeline replacement Work and is therefore included in
[MasTec’s] project Scope of Work as defined in the bid documents.
[MasTec’s] execution of the construction agreement represented that
[MasTec] had fully acquainted itself with the site, including without
limitation, the general topography, . . . subsurface conditions,
obstructions, and all other conditions pertaining to the Work and made
all investigations essential to a full understanding of the difficulties
which may be encountered in performing the Work, and that anything
in the contract or in any representations, statements or information made
or furnished by [El Paso] or any of it [sic] representatives
notwithstanding, [MasTec] assumed full and complete responsibility for
any such conditions pertaining to the Work or its surroundings and all
risks in connection therewith.

 
 
In a second letter of the same date, Bounds asked White to indicate by signing that
all of the change orders, which had been submitted to prior to September 1, had been
agreed upon. White signed the letter. White testified that there were no outstanding
change orders on the foreign crossings because the rains were ongoing, resolution of
the foreign pipeline issues was ongoing, and MasTec was completely unable to assign
a cost. The testimony at trial was that, in a check dated on or about this same date,
El Paso paid MasTec $48,000 for additional drilling costs associated with the
unidentified foreign crossings. 

The Lawsuit

          MasTec sued El Paso for breach of contract and fraud,


 alleging that El Paso
had, during the bidding process, provided MasTec with drawings, specifications, and
other materials so that MasTec could evaluate the work and prepare a bid, and that
MasTec relied on that information; that El Paso had represented that its existing
pipeline was either on top of the ground or buried no more than 12 inches below
ground, but that MasTec had discovered during deconstruction that the majority of
the existing pipeline was buried two to five feet below ground level; that the Contract
required El Paso to employ due diligence in identifying or marking all foreign
crossings, that El Paso had failed to do so, and that El Paso had misrepresented the
true number of foreign crossings by 500 percent; that El Paso’s employees or agents
made promises to surface landowners with respect to services and improvements that
went beyond the scope of the Contract and the bid; and that El Paso had refused to
issue change orders or to compensate MasTec for any of the additional work. In the
alternative, MasTec sought to recover under theories of quantum meruit and quantum
valebant. MasTec sought $5.3 million in damages. 

          The matter was tried to a jury. The jury was asked in question one of the
charge whether El Paso had failed to comply with the contract, and the jury was
instructed that it “should consider whether El Paso exercised due diligence in locating
foreign pipelines and/or utility line crossings.” The jury answered, “Yes.” In
question three, the jury was asked what sum of money would “fairly and reasonably
compensate MasTec for its damages, if any, that resulted from El Paso’s failure to
comply with the contract.” The jury was instructed to consider any increased costs
incurred by MasTec as a result of unidentified foreign crossings and any
consequential lost profits. The jury answered, “$4,763,890.” Further, the jury found
that MasTec failed to comply with the contract by failing to complete the work
required and awarded El Paso $104,687.09 in damages.


 

          Subsequently, El Paso moved to disregard the jury’s findings and for judgment
notwithstanding the verdict. El Paso asserted that question one of the jury charge was
improperly worded and that “MasTec’s own contractual representations and
commitments conclusively preclude any recovery in its favor based on this finding.” 
Specifically, El Paso complained, 

Question No. 1 is framed as a breach of contract question and focused
on whether [El Paso] had exercised due diligence in locating foreign
pipeline and utility line crossings. [El Paso’s] efforts to locate these
crossings, however, came before the construction contract and the
representation regarding the crossings were contained only in the plans
and specifications for the project. Therefore, the contractual provision
regarding [El Paso’s] “due diligence” did not involve any future
performance but at best constituted a warranty.

 
El Paso contended that MasTec’s “Breach of Warranty” claim was precluded under
paragraph 8.1(a)(7) of the Contract, under which MasTec was precluded from relying
on “any warranty” by El Paso regarding due diligence in locating the foreign
pipelines and utility crossings and that MasTec assumed the associated risks.

          El Paso asserted that “[t]he fact that MasTec encountered more underground
pipeline crossings than were shown on the drawings was a risk it willingly and openly
assumed” and MasTec “has no breach of contract action against [El Paso] on this
basis.” 

 
          The trial court agreed. The trial court found, in pertinent part, as follows: 

El Paso Field Services, L.P.[,] moved for judgment on the ground that
no jury issue was submitted against it, and the Court is of the opinion
that El Paso Field Services, L.P.[,] is entitled to judgment. Therefore,
it is ORDERED, ADJUDGED, and DECREED that [MasTec] take
nothing against El Paso Field Services, L.P.




 
[MasTec] filed a motion for entry of judgment on the jury verdict. [El
Paso South


] filed a motion for entry of judgment . . . the Court finds
that the Contract at issue in this case between [MasTec] and [El Paso]
(admitted into evidence as Defendants’ Exhibit 1) is clear and
unambiguous. This Contract allocates the risk of any additional cost
incurred because of foreign pipeline crossings to [MasTec]. The Court
therefore grants [El Paso’s] motion (a) for judgment non obstante
verdicto and (b) to disregard certain jury answers. The jury’s answers
to Questions 1 and 3 in the court’s charge are immaterial and are
disregarded. It is accordingly ORDERED, ADJUDGED, and
DECREED that [MasTec] take nothing against [El Paso] on its claim for
additional compensation under the Contract. Because of this ruling,
MasTec is not entitled to recover any of its attorneys’ fees incurred in
the prosecution of its breach of contract claim against [El Paso].

 
          MasTec moved to “vacate, modify, correct, or reform” the judgment and,
alternatively, for a new trial. The trial court denied MasTec’s motion. This appeal
ensued.Judgment Notwithstanding the Verdict

          In its sole issue, MasTec contends that the trial court erred by granting JNOV
in favor of El Paso on the basis that MasTec assumed all of the risks associated with
unidentified foreign crossings because the trial court’s interpretation of the Contract
rendered the due diligence provision a nullity and improperly shifted the risks
associated with those crossings to MasTec. 

A.      Standard of Review

          A trial court may disregard a jury finding and enter a judgment notwithstanding
the verdict (“JNOV”) if the finding is immaterial or if there is no evidence to support
one or more of the jury findings on issues necessary to liability. Tiller v. McClure,
121 S.W.3d 709, 713 (Tex. 2003); Spencer v. Eagle Star Ins. Co. of Am., 876 S.W.2d
154, 157 (Tex. 1994); Williams v. Briscoe, 137 S.W.3d 120, 124 (Tex.
App.—Houston [1st Dist.] 2004, no pet.). A trial court may grant a motion for JNOV
if a directed verdict would have been proper. Tex. R. Civ. P. 301. 

          A question is “immaterial” when it should not have been submitted to the jury,
it calls for a finding beyond the province of the jury, such as a question of law, or
when it was properly submitted but has been rendered immaterial by other findings. 
Se. Pipe Line Co. v. Tichacek, 997 S.W.2d 166, 172 (Tex. 1999); Spencer, 876
S.W.2d at 157. 

          To determine whether there is no evidence to support the jury verdict, we view
the evidence in a light that tends to support the finding of the disputed fact and
disregard all evidence and inferences to the contrary. Tiller, 121 S.W.3d at 713. We
sustain the granting of a JNOV based on “no evidence” when the record discloses one
of the following: (1) a complete absence of evidence of a vital fact; (2) the trial court
is barred by the rules of law or evidence from giving weight to the only evidence
offered to prove a vital fact; (3) the evidence offered to prove a vital fact is not more
than a scintilla; or (4) the evidence establishes conclusively the opposite of a vital
fact. City of Keller v. Wilson, 168 S.W.3d 802, 810 (Tex. 2005); Tiller, 121 S.W.3d
at 713. More than a scintilla of evidence exists if the evidence supporting the finding
“rises to a level that would enable reasonable and fair-minded people to differ in their
conclusions.” Burroughs Wellcome Co. v. Crye, 907 S.W.2d 497, 499 (Tex. 1995).

          When, as here, a trial court specifies the ground upon which it grants a JNOV,
an appellant need only challenge the ground relied upon by the trial court. Voskamp
v. Arnoldy, 749 S.W.2d 113, 118 (Tex. App.—Houston [1st Dist.] 1987, writ denied). 
However, the appellee may assert on appeal the grounds that it alleged in its motion
for JNOV, but that were not relied upon by the trial court, to attempt to vitiate the
jury’s verdict. Tex. R. App. P. 38.2(b); Tex. R. Civ. P. 324(c); Voskamp, 749 S.W.2d 
at 118.

B.      Governing Principles of Law

          In construing a written contract, the primary concern is to ascertain and give
effect to the parties’ intentions as expressed in the document. Frost Nat’l Bank v. L
& F Distribs., Ltd., 165 S.W.3d 310, 311–12 (Tex. 2005). We consider the entire
writing and attempt to harmonize and give effect to all the provisions of the contract
by analyzing the provisions with reference to the whole agreement. Id. at 312. We
presume that the parties intended for every clause to have some effect. Heritage Res.,
Inc. v. NationsBank, 939 S.W.2d 118, 121 (Tex. 1996). No single provision is given
controlling effect. J.M. Davidson, Inc. v. Webster, 128 S.W.3d 223, 229 (Tex. 2003). 
We give terms their plain, ordinary and generally accepted meaning unless the
instrument shows that the parties used them in a technical or different sense.
NationsBank, 939 S.W.2d at 121. “In harmonizing these provisions, terms stated
earlier in an agreement must be favored over subsequent terms.” Coker v. Coker, 650
S.W.2d 391, 394 (Tex. 1983). We construe contracts “from a utilitarian standpoint
bearing in mind the particular business activity sought to be served,” and “will avoid
when possible and proper a construction which is unreasonable, inequitable, and
oppressive.” Frost Nat’l Bank, 165 S.W.3d at 312 (quoting Reilly v. Rangers Mgmt.,
Inc., 727 S.W.2d 527, 530 (Tex. 1987)).

          If, after the pertinent rules of construction are applied, the contract can be given
a definite or certain legal meaning, it is unambiguous, and we construe it as a matter
of law. Id.; Transcon. Gas Pipeline Corp. v. Texaco, Inc., 35 S.W.3d 658, 665 (Tex.
App.—Houston [1st Dist.] 2000, pet. denied) (holding that “[i]f the contract is
unambiguous, the court must enforce the contract as written.”). However, if the
meaning of the contract remains uncertain or is susceptible to more than one
reasonable interpretation, it is ambiguous. Nat’l Union Fire Ins. Co. v. CBI Indus.,
Inc., 907 S.W.2d 517, 520 (Tex. 1995); Coker, 650 S.W.2d at 393–94. 

          Whether a contract is ambiguous is a question of law to be determined “by
looking at the contract as a whole in light of the circumstances present when the
contract was entered.” Coker, 650 S.W.2d at 394. Only when a contract is first
determined to be ambiguous may the courts consider the parties’ interpretation and
admit extraneous evidence to determine the true meaning of the instrument. Nat’l
Union Fire Ins. Co., 907 S.W.2d at 520. An ambiguity does not arise simply because
the parties advance conflicting interpretations of the contract. Forbau v. Aetna Life
Ins. Co., 876 S.W.2d 132, 134 (Tex. 1994).

 
          A court may conclude that a contract is ambiguous even in the absence of such
a pleading by either party. Sage St. Assocs. v. Northdale Constr. Co., 863 S.W.2d
438, 445 (Tex. 1993).

C.      Due Diligence 

          MasTec directs us to Specifications LP-5 and LP-17 of the Contract, which
specifically address foreign crossings and provide that El Paso “will have exercised
due diligence in locating” the crossings, as follows:

2.COMPANY FOREIGN LINE AND UTILITY CROSSINGS
[El Paso] will have exercised due diligence in locating foreign pipelines
and utility line crossings. However, the contractor shall confirm the
location of all such crossings and notify the owner prior to any ditching
activity in the vicinity of the crossings. . . .. . . .

          2.       FOREIGN LINE AND UTILITY CROSSINGS

[El Paso] will have exercised due diligence in locating foreign pipelines
and/or utility line crossings. However, the Contractor shall confirm the
location of all such crossings and notify the owner prior to any HDD



activity in the vicinity of the crossings. Contractor shall be responsible
for all damages to foreign pipelines and/or utility line crossings during
HDD operations. Contractor shall repair damaged foreign pipelines
and/or utility line crossings to original or better condition and meet
Company approval. In all cases, foreign pipelines, utility line crossings
and/or structures take precedence over Company tolerances. 

 
(Emphasis added.)

          The plain language of these provisions reflect that El Paso made a positive
assurance that due diligence was used in locating its foreign crossings. See
NationsBank, 939 S.W.2d at 121. It is undisputed that MasTec had a duty prior to
actually digging or drilling to confirm the location of the crossings because it is
common for pipeline positions to vary several feet from the positioning noted on the
alignment sheets and because of the expense of repair and safety hazards involved
with striking a live pipeline. The issue is the language, emphasized above, in which
El Paso asserted that it had exercised due diligence in locating its foreign crossings,
which were depicted on the alignment sheets that were provided to MasTec as the
basis for MasTec’s bid. 

          The term “due diligence” means “[t]he diligence reasonably expected from, and
ordinarily exercised by, a person who seeks to satisfy a legal requirement or to
discharge an obligation.” Black’s Law Dictionary 468 (7th ed.). Whether a party
has exercised “due diligence” is a question of fact. Wheeler v. Methodist Hosp., 95
S.W.3d 628, 637 (Tex. App.—Houston [1st Dist.] 2002, no pet.). 

          Dial, a forensic engineer testifying for Mastec, testified that “due diligence” in
the pipeline industry means that, before soliciting bids for construction, the operating
company has (1) gathered any “one-call” information in their catalog; (2) sent out a
survey crew; (3) and sent their landmen to talk with the landowners from whom the
company obtained its right-of-way easements because the landowners are the best
source of information regarding any other easements that have been granted to other
pipeline operators in the same area. In addition, here, because there is an existing
Valero pipeline in the same right-of-way and parallel to the subject pipeline, “it
would have been prudent for El Paso to contact Valero and compare as-built drawings
to see if they were aware of other foreign crossings in that area.” Dial explained that
the contractor cannot see what is physically underground and has to rely on
information given by the operator. El Paso owns the line, controls the easement, and
has access to what crosses through the area.

          Ross, of El Paso, testified that El Paso had the preliminary alignment sheets
that were created in the 1940s for the pipeline at issue, but that he could not recall
having seen any as-built alignment sheets. Ross testified that the alignment sheets
came from the operating company, Coastal, from whom El Paso had purchased the
pipeline, that the sheets “were very poor,” “very inadequate,” and would not have
shown any of the crossings that were installed after the 1940s. Ross said that he did
not believe that the alignment sheets were ever updated. Ross testified that he could
not recall having seen the alignment sheets for Valero’s line, Ross testified that he did
not instruct Gullett to attempt to locate or mark any of the underground PVC or
fiberglass lines unless such lines could be seen “by something visual.” Ross further
stated that he did not inquire regarding whether El Paso had any “one call”
information cataloged and did not attempt to contact any of the landowners or other
operating companies along the pipeline route. 

          Further, the jury heard testimony by Schubert, survey supervisor for Gullett,
that he was asked to locate all the foreign crossings that he could locate “strictly with
the M-scope.” Schubert testified that he did not attempt to find any PVC or fiberglass
lines because it was not part of El Paso’s instructions. The record shows that the
alignment sheets that Gullett prepared for El Paso to give to the contractors for
bidding purposes showed 282 foreign crossings. Schubert testified that, when he was
sent out at the close of the Project, he located 274 additional crossings and 126
additional tie-ins. According to Gullett, the as-built drawings it prepared after
MasTec completed the Project showed 343 additional foreign crossings—208 of
which were metal. 

          Perkins testified that, during construction, MasTec located 794 foreign
crossings. Two hundred of those crossings were metal pipelines that had not been
identified on the alignment sheets. Two hundred and seventeen additional tie-ins
were required. 

 
          From this evidence, the jury could have reasonably concluded, as it did in
Question One, that El Paso breached the due diligence provision of the Contract. 

D.      Risk Allocation

          El Paso contends that, without regard to whether it used due diligence to locate
its foreign crossings or whether the crossings were noted on its alignment sheets, 
MasTec assumed the risks of any costs attributable to unidentified foreign crossings
by submitting a lump-sum bid that was to cover all of the work, as provided at Article
2.1 of the Contract:

[MasTec] agrees, at its cost, that it shall (except as otherwise provided
for in the Contract or Drawings) furnish all necessary materials,
supplies, labor, tools, equipment superintendence, apparatus and
machinery, including without limitation, transportation and all other
items necessary to perform the Work for the construction and
completion . . . .In addition, El Paso contends that, at Exhibit B-1 of the Contract, “Contractor’s
Proposal,” MasTec agreed to perform “everything necessary to complete, satisfy, and
discharge all Work and obligations imposed on [MasTec] connected with the
performance of the Work,” including, as follows: Furnish all labor, equipment and materials as described in the
Specifications for all Work necessary to perform the following
applicable Work as shown on the Drawings, including but not limited
to: loading, hauling, unloading, storing, clearing, excavating, including
rock if encountered, cutting and beveling of pipe; installing pipe or
valves, where required; removing pipe or valves, where required;
welding (including tie-in and transition welds, if required); coating,
repairing coating, furnishing and installing padding when applicable;
installing concrete supports; blow-offs, bypasses, bolting, bracing
hydrostatic testing of completed assemblies, painting of newly installed
piping assemblies and cleanup.

 
          Further, El Paso points out that, at paragraph 15 of Exhibit B-1, even if any
item was not specifically identified, it was still part of the scope of work and MasTec
was responsible for it under the Contract, as follows:

Any Work required to complete installation of the new pipeline but not
shown as a pay item is no less included in the scope of work for
installation of the new 8-inch Butane Shuttle pipeline and is included in
[MasTec’s] lump sum proposal. Just because an item of Work is not
specifically identified, does not mean such Work is not included in
[MasTec’s] scope of Work. Any item of Work [MasTec] knows is
required for completion of the installation but not specifically identified
is to be included in [MasTec’s] Lump Sum Proposal.

 
El Paso contends that, pursuant to these paragraphs, “MasTec agreed to perform all
the work necessary to complete the job for the lump sum price.” The plain language
of these provisions reflects that MasTec promised to furnish everything needed to
perform the scope of work. See NationsBank, 939 S.W.2d at 121. Notably, however,
El Paso included language indicating “Any item of Work [MasTec] knows is required
for completion. . . .” (Emphasis added.)

          In addition, contends El Paso, the risk of unidentified crossings was allocated
to MasTec in Article 8.1(a)(7.) of the Contract, as follows: 

[MasTec] represents that it has had an opportunity to examine, and has
carefully examined, all of the Contract documents and has fully
acquainted itself with the Scope of Work, design, availability of
materials, existing facilities, the general topography, soil structure,
substructure conditions, obstructions, and all other conditions
pertaining to the Work, the site of the Work and its surroundings; that
it has made all investigations essential to a full understanding of the
difficulties which may be encountered in performing the Work; and that
anything in any of the Contract documents or in any representations,
statements or information made or furnished by [El Paso] or its
representatives notwithstanding, [Mastec] will regardless of any such
conditions pertaining to the Work, the site of the Work or its
surroundings, complete the Work for the compensation stated in this
Contract, and pursuant to the extent of [MasTec’s] liability under this
Contract, assume full and complete responsibility for any such
conditions pertaining to the Work, the site of the Work or its
surroundings, and all risks in connection therewith. In addition thereto,
[MasTec] represents that it is fully qualified to do the work in
accordance with the terms of this Contract within the time specified.
(Emphasis added.)
          MasTec responds that this provision does not govern the due diligence
provisions because, although it mentions “substructure conditions, obstacles, and all
other conditions,” it does not mention foreign crossings. As MasTec contends, we
generally construe a specific provision to govern over a general. McCreary v. Bay
Area Bank & Trust, 68 S.W.3d 727, 731–32 (Tex. App.—Houston [14th Dist.] 2001,
pet. dism’d). 
          Even if Article 8.1(a)(7) includes foreign crossings in the emphasized
language, we must consider the entire writing and attempt to harmonize and give
effect to all the provisions of the Contract by analyzing the provision with reference
to the whole Contract, including the due diligence provisions. See Frost Nat’l Bank,
165 S.W.3d at 312. We presume that the parties intended for every clause to have
some effect, see NationsBank, 939 S.W.2d at 121, and no single provision may be
given controlling effect. See Webster, 128 S.W.3d at 229. 
          Hence, MasTec’s assumption of risk under the Contract must be considered in
light of El Paso’s assurances under the Contract. MasTec directs us to Shintech Inc.
v. Group Constructors, Inc., 688 S.W.2d 144, (Tex. App.—Houston [14th Dist.]
1985, no writ), and IT Corporation v. Motco Site Trust Fund, 903 F.Supp. 1106 (S.D.
Tex. 1994).
          In Shintech, the court allowed a contractor to recover for damages in spite of
a site inspection clause and the contractor’s assumption of risk under the contract. 
Shintech Inc., 688 S.W.2d at 151. There, owner Shintech engaged a contractor,
Group, to finish an industrial plant expansion. Id. at 147. Group submitted a lump
sum bid to “furnish all labor, construction services, and supplies necessary,” which
was accepted. Id.
          During the project, Shintech allegedly interfered with the efficiency of Group’s
work. Group sued Shintech, asserting, inter alia, that Group incurred expenses based
on Shintech’s “excessive design errors, changes, and extra work orders.” Id. at
147–48 (emphasis added). The trial court rendered judgment in favor of Group. Id.
at 148.
          On appeal, the court recognized that a contractor is entitled to recover from an
owner for losses due to delay and hindrance of its work if it proves (1) that its work
was delayed or hindered, (2) that it suffered damages, and (3) that the owner was
responsible for the act or omission that caused the delay or hindrance. Id. Shintech
complained that, in the contract, Group had assumed the risk of delays and hindrances
as follows: “Having fully acquainted itself with the work, the site of the work, its
surroundings and all risk in connection therewith, the contractor assumes full and
complete responsibility for completing the work for the compensation and within the
time provided . . . .” Id. at 151 (emphasis omitted). The court rejected Shintech’s
theory, stating that it found no evidence that Group had knowledge of defective
specifications prior to beginning its work. Id. In addition, the court found that the
Shintech contract also provided, “Upsets of [the construction schedule] caused by acts
of the client [Shintech] or those over which he controls causing undue expense on the
contractor [Group] shall be for the owner’s [Shintech’s] account.” Id. at 148
(emphasis omitted). 
          Here, like the contractor in Shintech, MasTec agreed to supply all services,
labor, and materials necessary under a lump sum contract; MasTec agreed to inspect
the site and to assume responsibility for timely completing the work for the agreed
compensation; MasTec later discovered excessive errors in the specifications
provided by El Paso; and MasTec did not have knowledge of the defective
specifications prior to beginning its work. Also, the Contract herein provides at
Article 4.6, “COMPENSATION FOR DELAYS IN PERFORMANCE OF WORK,”
section b, “For delays in the performance of the Work attributable to [El Paso], it is
agreed that the compensation and/or amounts due [MasTec] in full and complete
settlement of such delays shall be as follows: [various lump sum settlement or
reimbursement options].” Hence, there is some evidence in the Contract of intent to
allocate to El Paso those expenses that cause MasTec delay and that are attributable
to El Paso.
          MasTec also directs us to IT Corporation, a case from the southern district of
Texas. 903 F.Supp. 1106. There, the Environmental Protection Agency required
Monsanto to perform remedial action at Monsanto’s hazardous waste site. Id. at
1111. Monsanto sent to contractors a request for proposal and scope of work (“bid
documents”) that included technical data concerning the chemical waste at the site,
as prepared by Monsanto’s consultants. Id. A letter accompanying the bid
documents stated that the waste characteristics were “for information only and will
not establish the basis for qualifying bids, quantities, methods, compositions, etc. We
feel that sufficient information is available to allow a responsible, experienced
contractor to provide a lump sum bid for the service required. . . .” Id. at 1117. The
bid documents specified that on-site incineration was to be the primary remedial
method employed. Id. at 1111.
          Although the letter accompanying the bid documents stated that the waste
characteristics given were for information only, the proposed bid format stated that
the information shown in the specifications “shall be used” in determining the lump
sum price; that the “data is based upon test results by an independent consultant and
is considered reliable”; that the contractor should include a “suitable contingency
based upon the contractor’s experience”; and that “no cost adjustments will be
allowed for surface debris quantities different from those noted.” Id. at 1117–18.
          Contractor ITC visited the site, obtained waste samples, performed limited
testing, and submitted its lump-sum bid with a signed statement that it was familiar
with the site. Id. at 1111. ITC was awarded the contract. Id.
          The contract defined the scope of work as follows:
The “Work” to be performed by Contractor under this Agreement shall
consist of furnishing all personnel, supervision, services, field labor,
materials, tools, equipment, supplies and all things required for the
necessary design, engineering, construction of facilities and all
associated services to properly complete the Remedial Action in strict
accordance with the Project Scope of Work . . . .
Contractor shall provide all labor, material, equipment and supervision
required to completion the remediation . . . .

 
Id. at 1119.  The Scope of Work section in the bid documents and the contract
included extensive tables and maps describing the geologic and hydrologic
characteristics of the site. Id. 

          During the work, ITC discovered that the waste characteristics were not as
Monsanto had specified in the bid documents. Id. at 1111–12. ITC notified Monsanto
that ITC could not reasonably have discovered the errors until ITC had performed
extensive work at the site and that these differences had a drastic impact on efficiency
of incineration and costs. Id. at 1112. ITC claimed that it could not do the work for
the price it bid because the work was not as represented by Monsanto. Id. Monsanto
refused to consider ITC’s claims until ITC completed a “trial burn.” Id. ITC
continued to work under the contract while the parties negotiated. The parties were
unable to find compromise, and ITC suspended its work. Id.

          ITC sued Monsanto for, inter alia, breach of contract, alleging that ITC had
been forced to discontinue work because Monsanto has misrepresented the site
conditions. The jury returned a verdict in favor of ITC. Id.

          On appeal, Monsanto contended that any misrepresentation in the bid
documents was not a breach of the contract. Id. at 1115. The court disagreed,
holding that Monsanto had made assertions concerning the characteristics of the
waste that were materially false and that ITC, although it had not investigated the
accuracies of the characteristics described in the bid documents, was not estopped
from asserting breach of contract. Id. at 1115–16.

          In addition, Monsanto argued that the contract placed the risk of the site
conditions on ITC, that ITC had assumed the risk by verifying with its bid that it was
familiar with the site conditions, and that ITC was estopped by its investigation from
complaining about any misrepresentations in the RFP. Id. at 1116. Monsanto further
argued that, as a matter of law, the contract placed the risk of differing or unexpected
site conditions on the contractor, required the contractor to investigate the site prior
to bidding, and that the contractor directed his own work under the contract. Id. 

          ITC did not dispute that it was required to perform the contract for a lump sum. 
Id. at 1117. ITC asserted, however, that the contract did not require it to bear the risk
that the bid documents misrepresented the nature and amount of the work to be
performed. Id. 

          The court considered whether, in a lump sum contract in which the contractor
has had a right to inspect the site before bidding, the risk that the owner’s
specifications are inaccurate or inadequate to perform the job falls on the contractor
as a matter of law. Id. at 1120. 

 
          In IT Corp., as does El Paso in the case before us, the appellee-owner relied on
Lonergan v. San Antonio Loan & Trust Co., 104 S.W. 1061 (Tex. 1907), and Emerald
Forest Utility District v. Simonsen Construction Co., 679 S.W.2d 51 (Tex.
App.—Houston [14th Dist.] 1984, writ ref’d n.r.e.), to support its contention that the
risk falls on the contractor. Id.

          In Lonergan v. San Antonio Loan & Trust Co., the Texas Supreme Court held
that a contractor was not excused from performance under a contract to build a house
even though the plans and specifications that were prepared by the owner’s architect
proved to be defective. 104 S.W. 1061, 1065 (Tex. 1907). After the nearly
completed house collapsed, the contractor abandoned the job, and the owner sued for
breach of contract. Id. at 1062. The contractor answered that the house collapsed
because the plans and specifications were defective. Id. The court held that the
contractor was not excused from his contractual obligations to build the house
because the owner was not in a better position than the contractor to discover the
inadequacies in the plans and there was no express or implied contractual language
that would justify a conclusion that the parties intended that the owner be liable. Id.
at 1066. 

          In Emerald Forest Utility District v. Simonsen Construction Company, the
contractor agreed to construct an underground sewer system according to plans
furnished by the owner. 679 S.W.2d 51, 52 (Tex. App.—Houston [14th Dist.] 1984,
writ ref’d n.r.e.). The instructions to bidders had provided for independent
investigation of the work site and stated that the submission of a bid was to be
“conclusive evidence” that the contractor was “fully acquainted and satisfied” with
the quality and quantity of work. Id. at 53. During construction, the contractor
encountered “very wet sand conditions.” Id. at 52. There was testimony that an
alternate “wet sand construction method” should have been applied. Id. After the
contractor completed the work, the sewer lines failed. Id. The owner sued the
contractor. Id. A jury concluded that the lines failed because the design provided by
the owner was insufficient. Id. The court examined the contract and held that the
owner had not expressly or implicitly promised that the plans provided were
sufficient for the work. Id. at 53.

          The IT Corp. court, holding in favor of ITC, concluded that the case before it
did not present a situation similar to those involved in Lonergan or Emerald Forest
because the contractor did not have the same opportunity or ability as the owner to
gather information about the site and to judge the sufficiency of that information
before submitting its bid. 903 F. Supp. at 1120–21, 1123.

          Here, like IT Corp., the evidence shows that MasTec was not in as good a
position as El Paso to gather critical information concerning underground foreign
crossings and to judge the sufficiency of the alignment sheets that El Paso provided
before submitting its bid. El Paso was in a better position to gather the information
concerning foreign crossings because it owned the existing pipeline, the easements
along the right-of-way, as well as a second pipeline in the same corridor. El Paso had
access to its “one call” catalog, the contact information for area landowners, and the
alignment sheets on its other pipeline. In addition, the parallel pipeline owned by
Valero, which was purchased from El Paso, had alignment sheets showing most of
the plastic lines. 

          The Contract required MasTec to make visual observations of the site
conditions, and, in its Invitation to Bid, El Paso urged, “Aerial inspection is highly
recommended.” MasTec undertook aerial inspection and landed in several places
along the right-of-way. The testimony shows, however, that the extent of the
underground foreign crossings at issue could not have been ascertained from such
inspections. Notably, MasTec presented evidence that El Paso limited or restricted
MasTec’s access to O’Connor Ranch during bidding, where the majority of the
unidentified crossings were later found. Like in IT Corp., there is no indication that
MasTec was required as a result of its observations to undertake a full sampling and
analytical program to determine whether the condition of the foreign crossings shown
in El Paso’s alignments sheets was accurate. As in IT Corp., it would be reasonable
to conclude that there was insufficient time between the request for bids and the
deadline to submit the bid to carry out an investigation into the accuracy of El Paso’s
underground data. Moreover, nothing in the bid package indicated that the foreign
crossing information was an estimate or was uncertain or should not be relied on by
Mastec. El Paso stated in its bidding instructions that “[t]he scope of work [was]
believed to be complete.” MasTec submitted its bid and executed the Contract based
on the assurances in the specifications and incorporated into the Contract that El Paso
“will have exercised due diligence” in assuring the accuracy of the alignment sheets
on which El Paso instructed that MasTec’s bid was to be based. Hence, similar to IT
Corp., MasTec’s assumption of risk under the Contract was based on the premise that
El Paso was performing with the due diligence it promised in the Contract.

           As did the court in IT Corp., we conclude that this case is most similar to
Hollerbach v. United States, 233 U.S. 165, 34 S. Ct. 553 (1914), which is also cited
by MasTec. 

          In Hollerbach, the United States Supreme Court allowed a contractor to
recover his extra expenses when he discovered, during construction, deficiencies in
owner-provided specifications in a contract that had also required a pre-bid,
independent investigation of the jobsite by the contractor. Id. at 172, 34 S. Ct. at 556. 
There, the contractor, Hollerbach, contracted with the government to remove and
rebuild a river dam. Id. at 167, 34 S. Ct. at 554. The contract specifications provided,
inter alia, that “[t]he dam is now backed for about 50 feet with broken stone, sawdust,
and sediment to a height of within 2 or 3 feet of the crest, and it is expected that a
cofferdam can be constructed with this stone . . . .” Id. at 168, 34 S. Ct. at 554. In
addition, “[t]he excavation behind the dam will be required to go to the bottom . . . .” 
Id. The contract also provided, “It is expected that each bidder will visit the site of
this work, . . . and ascertain the nature of the work, the general character of the river
as to floods and low water, and obtain the information necessary to enable him to
make an intelligent proposal.” Id. The contract further provided, 

It is understood and agreed that the quantities given are approximate
only, and that no claim shall be made against the United States on
account of any excess or deficiency, absolute or relative, in the same. 
Bidders . . . are expected to examine the maps and drawings in this
office, which are open to their inspection, to visit the locality of the
work, and to make their own estimates of the facilities and difficulties
attending the execution of the proposed contract, including local
conditions, uncertainty of weather, and all other contingencies.

 
Id. at 167, 34 S. Ct. at 554. 

          During construction, Hollerbach discovered that the dam was not backed with
broken stone, sawdust, and sediment, as stated in the specifications. Id. at 168, 34 S.
Ct. at 554. Rather, the backing was composed of “soft, slushy sediment” on top and
a “cribwork” of “sound logs filled with stone” underneath. Id. The trial court refused
recovery of the additional expenses Hollerbach incurred to complete the project. Id.
at 169, 34 S. Ct. at 554. 

          The Supreme Court reversed, concluding that the specifications assured the
contractor of the character of the material—a matter upon which the owner “might
be presumed to speak with knowledge and authority.” Id. at 172, 34 S. Ct. at 556. 
The Court further explained,

We think this positive statement of the specifications must be taken as
true and binding . . . . We think it would be going quite too far to
interpret the general language of the other paragraphs as requiring
independent investigation of facts which the specifications furnished by
the [owner] as a basis of the contract left in no doubt. If the [owner]
wished to leave the matter open to the independent investigation of the
claimants, it might easily have omitted the specification as to the
character of the [site] . . . . In its positive assertion of the nature of this
much of the work it made a representation upon which the claimants had
a right to rely without an investigation to prove its falsity.

 
Id.

          Here, like Hollerbach, El Paso made assurances concerning the quantity of its
foreign crossings. In the materials El Paso submitted to MasTec as the basis of its
bid, El Paso stated that it had exercised due diligence in locating any foreign
crossings in the right-of-way and it showed that there were 282 such crossings. As
MasTec contends, the Contract does not disclaim knowledge concerning the actual
number of foreign crossings or indicate that the quantity stated should not be relied
on. Cf. I.O.I. Sys. Inc. v. City of Cleveland, 615 S.W.2d 786, 789–90 (Tex.
App.—Houston [1st Dist.] 1980, writ ref’d n.r.e.) (holding that owner was not liable
for unforseen soil condition where contract provided that boring data provided by
owner to contractor was “not intended as anything other than a guide” and that the
contractor was not relieved by acceptance of the data from “his responsibility to
inquire, investigate, and inspect the underground conditions along the piping
alignment.”). To the contrary, El Paso told MasTec to prepare a lump-sum bid from
the information given and that the scope of work was believed to be complete. 

          Here, as in Hollerbach, if El Paso wished to leave open the matter of foreign
crossings to the independent investigation of MasTec, El Paso could have simply left
the due diligence provision out of the Contract. As MasTec contends, by El Paso
having written into the Contract that due diligence was used in locating the foreign
crossings on El Paso’s alignment sheets—a matter upon which El Paso might be
presumed to speak with knowledge and authority—MasTec had a right to rely on that
information in preparing its bid. See Hollerbach, 233 U.S. at 172, 34 S. Ct. at 556.
(“In its positive assertion of the nature of this much of the work it made a
representation upon which the claimants had a right to rely without an investigation
to prove its falsity.”).

 
          In sum, the caselaw demonstrates that a contractor is not precluded as a matter
of law from recovering against an owner, under a breach of contract theory, for
defective specifications, notwithstanding lump-sum and pre-bid investigation
provisions in the contract, if the owner was in a better position to know whether its
specifications were sufficient for its intended scope of work and the contract
evidences that the owner made positive assurances concerning the reliability of those
specifications. See id.; see IT Corp., 903 F.Supp. at 1120.


 Even when the contract
places the risk of differing or unexpected site conditions on the contractor, the
contractor is not, as a matter of law, required to bear a risk that the bid documents
misrepresent the nature and amount of the work to be performed. Id. at 1116. 

          Applying the caselaw here, we conclude that MasTec is not precluded as a
matter of law from recovery against El Paso for the deficiencies in the alignment
sheets, notwithstanding MasTec’s assumption of risk under the Contract. The jury’s
findings in questions one and three, that El Paso promised in the Contract that it had
exercised due diligence in locating the foreign crossings and that El Paso breached
its promise by providing specifications that were so grossly inaccurate that MasTec
was damaged, are not immaterial. See Tichacek, 997 S.W.2d at 172 (stating that trial
court may disregard jury answer and enter judgment notwithstanding the verdict if
jury finding is immaterial and that finding is immaterial when it calls for finding
beyond province of jury, such as question of law). 

          Further, there is some evidence to support the jury’s answers. The evidence
shows that, as part of the pre-bid package, El Paso presented to MasTec the Contract,
the specifications for the Project, and alignment sheets purporting to show the foreign
crossings in the pipeline right-of-way. The specifications, which were made part of
the Contract, provide that El Paso “will have exercised due diligence” in locating the
foreign crossings. The testimony shows that El Paso expressly informed MasTec at
the pre-bid meeting that the scope of work was believed to be complete and that it
should prepare its bid based on the pre-bid documents. El Paso recommended that
MasTec conduct an aerial inspection of the pipeline corridor, and MasTec complied.

          The jury heard testimony concerning the meaning of due diligence in the
pipeline construction industry. Ross, of El Paso, testified that he did not instruct
Gullett to attempt to locate or mark any PVC or fiberglass lines; that he did not
inquire as to whether El Paso had any “one call” information cataloged; and did not
attempt to contact any of the landowners or other operating companies along the
pipeline route—including Valero, who had purchased the parallel pipeline in the
same corridor from El Paso. The testimony showed that Valero’s alignment sheets,
which were subsequently used by MasTec to locate the crossings in and around El
Paso’s pipeline, showed most of the underground crossings at issue in this suit.

          Hence, the evidence shows that El Paso defined the scope of work and made
positive assurances that it had used due diligence with regard to developing the
specifications that El Paso instructed MasTec to use as a basis for its bid. By making
positive assurances, El Paso assumed some responsibility for the accuracy of the
specifications. MasTec was not in as good a position as El Paso to gather critical
information concerning the extent of the underground foreign crossings or to judge
the sufficiency of the alignment sheets that El Paso provided before submitting its
bid. MasTec’s assumption of risk under the Contract was necessarily based on the
premise that El Paso was already performing under the Contract, namely, that it had
performed the due diligence it promised. We cannot conclude that there is no
evidence to support the jury’s findings. See Tiller, 121 S.W.3d at 713.

          Further, by reading Article 8.1(a)(7) to mean that MasTec globally assumed all
risks associated with unidentified foreign crossings renders meaningless El Paso’s
assurances in the Specifications that it used due diligence in locating those
underground crossings. We cannot construe a contract in a manner that renders a
provision meaningless.

          Having reviewed all of the evidence in the light most favorable to the jury’s
findings, we conclude that the findings were not immaterial or based on insufficient
evidence. See Tiller, 121 S.W.3d at 713; Tichacek, 997 S.W.2d at 172. We hold that
the trial court’s granting of a JNOV was improper. See Wilson, 168 S.W.3d at 807.

          Accordingly, we sustain Mastec’s sole issue.

CONCLUSIONWe conclude that the trial court erred by granting judgment notwithstanding
the verdict on MasTec’s breach of contract claim. We reverse the trial court’s
judgment as to this claim and remand for entry of judgment consistent with the jury’s 
verdict and for the assessment of attorney’s fees in favor of MasTec. 





 
                                                             Laura Carter Higley 

                                                             Justice

 
Panel consists of Justices Jennings, Keyes, and Higley.

Justice Jennings, dissenting.