

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-14-00211-CV

IN THE INTEREST OF K.W. AND
K.W., MINOR CHILDREN

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 323-97971J-13

----------

## MEMORANDUM OPINION[1]

----------

## I. INTRODUCTION

Appellant Mother[2] appeals from the trial court's order terminating her

parental rights to her twin children, Boy and Girl. In three issues, Mother

challenges the legal and factual sufficiency of the evidence to support the

---

[1]*See* Tex. R. App. P. 47.4.

[2]In appeals from cases involving the termination of parental rights, the rules of appellate procedure require the use of an alias to refer to a minor, "and if necessary to protect the minor's identity, to the minor's parent or other family member." Tex. R .App. P. 9.8.(b)(2).

termination of her parental rights and the appointment of The Texas Department of Family and Protective Services (Department) as sole managing conservator of the two children.  We will affirm.

## II. BACKGROUND

On September 29, 2012, Mother gave birth to Boy and Girl in Midland–Odessa, Texas, several weeks before their due date.  Prior to February 2013, and due to extreme congenital medical conditions, Boy and Girl were admitted for treatment at Cook Children's Medical Center in Fort Worth, Texas (Cook Children's).

On or about February 15, 2013, the Department removed the children, who were still hospitalized, from Mother's care because of concerns expressed by Cook Children's employees that Mother could not care for the children.  On February 22, 2013, the trial court approved temporary orders appointing the Department as temporary managing conservator of the children.  At that time, Mother was ordered to have limited access to and possession of the children, and the Department provided a family service plan to Mother outlining her responsibilities in order to reunite her with the children.

On June 17, 2014, the trial court heard the Department's petition seeking termination of Mother's parental rights to Boy and Girl.  Heather South, a caseworker supervisor with the Department, supervised the children's case between July 2013 and April 2014.  Via deposition, the transcript of which was admitted at the termination trial, South testified that shortly after they were born,

both children were placed in Cook Children's because of medical issues. South said that both children's medical issues are serious and some are life-threatening. Both children require medical monitors and specialized medical equipment for their medical conditions.

According to South, during the time she supervised the case, Mother visited Boy only once and Girl only twice. South testified that throughout the time she supervised this case, Mother "didn't actively call to check up on the kids [or] express her love and desire for them." South also said that Mother never provided clothing, shoes, birthday cards, toys, or diapers for either child during South's supervision of the case. South further testified that Mother has another child born prior to Boy and Girl that is not in Mother's care and custody.

South averred that the Department made numerous phone calls, sent letters, and emailed Mother in attempts to encourage Mother's participation in the children's lives and Mother's service plan. South stated that the Department had even set up a "courtesy worker" to "go see [Mother] when she was in jail." By South's account, the Department attempted to facilitate visitation between Mother and the children by using an investigator, by transporting Girl to Mother's known living area, and by purchasing multiple "Greyhound bus tickets to help facilitate visitation" between Mother and the children. South said that although Mother did use one of the bus tickets to come and see the children, Mother did not otherwise utilize other bus tickets for transportation to visit the children. By South's account, Mother's sparse visitation stood in stark contrast to the efforts of the

Department, which had offered to transport Mother to Cook Children's "every other Monday."

In addition to its attempts to facilitate visits between Mother and the children, South stated that the Department had offered Mother a service plan to facilitate a return of the children to Mother and had provided resources such as "YWCS and Promise House" in attempts to "get [Mother] stable." Due to concerns over Mother's psychological health and drug use, coupled with the children's special medical needs, the Department received approval for Mother to receive "in-home therapy," but Mother did not avail herself of it. The Department even let Mother "know many times that Cook Children's offers training programs." Despite the hospital offering a "consistent" visitation schedule for the medically challenged children, Mother did not utilize or take advantage of these services or visitations.

South testified that Boy resided in Cook Children's Hospital for the first year of his life and that to her knowledge he was still there and being treated at the time of her deposition in June 2014. By this time, Girl had been placed in foster care for children with "primary medical needs." Despite this fact, Mother failed to take advantage of the Department's offer to transport her to Cook Children's for Girl's medical appointments, during which Mother would have received training in how to cope with Girl's medical needs. Mother also typically failed to take advantage of these services pertaining to Boy's medical needs, which included the need to take care of and change a tracheotomy tube. South

4

stated that the only exception to Mother's failure to attend this training occurred once in March 2014.

South did state that Mother had "self-reported" that she had completed a parenting class and that she at one time professed to being employed by WalMart, but South averred that she had never seen any proof that Mother had ever been employed during South's supervision of the case. Other than the self-reported parenting class, South said that Mother had not completed "anything else" from her service plan. South went on to state that during the time she supervised this case, Mother failed to demonstrate that she could provide either child a safe and stable place to live. South averred that during the time she supervised the case, Mother moved from residence to residence and had been incarcerated during October and November 2013. South testified that Mother's incarceration was for past warrants for possession of marijuana and another unrelated charge, and that at the time of South's deposition, Mother resided with her live-in boyfriend.

South also testified that Mother had failed to demonstrate any ability to meet the emotional and physical needs of either child. Specifically, South said that Mother had never demonstrated that she wanted the children full-time; that Mother had made minimal efforts to maintain contact with the children; and that the vast majority of contact between the Department and Mother had been initiated by the Department and not Mother. Moreover, South stated that despite Mother's knowledge that both children had "significant medical needs," Mother

5

never demonstrated that she could or would attend the necessary "training and support to help care for them." South also said that Mother was incapable of providing either child with even "minimally adequate health care and nutritional care." According to South, Mother never demonstrated the ability to protect either child from emotional or physical danger because "[s]he wasn't involved enough to even show what her abilities were as far as being a safe parent or a protective parent." South also testified that early in the case, Mother told South that she was not able to take care of the children's medical needs and that Mother even confessed to having a "drug use concern history."

South opined that it was in both children's best interests that Mother's parental rights be terminated. South testified that her opinion was based on the fact that Mother had "had every opportunity to take advantage" of what the Department and hospital had offered her to learn how to care for her medically needy children and that she simply had not. South continued that it was "apparent that these kids are going to have forever needs that are pretty serious" and that even though it may be difficult to find an adoptive home for them based on their medical conditions, the children needed a stable home if it was at all possible. South stated that based on Mother's lack of contact, the best interests of the children would be served by finding a "permanency . . . that's appropriate for [these] children."

Speaking specifically to the Department's goals of placing the children in an adoptive home, South said that if adopted, the children would benefit from the

6

Department's adoption assistance program. South said that through this program, the children would have access to Medicaid until they were eighteen, would be provided a monthly stipend to support their needs, and would qualify for "free college and education." To the contrary, South said that if the children were not placed with an adoption agency and left to remain in Mother's care, based on her conduct during the children's temporary placement with the Department, they may not be loved or cared for until they are at least eighteen.

At trial, Cha'Keira Dalton, a conservatorship caseworker for the Department, testified that she was assigned to this case between February and June 2013 and that South had been her supervisor. Dalton stated that both children tested positive for marijuana at birth and that they were hospitalized at Cook Children's because they "were significantly medically fragile and required significant care." According to Dalton, Girl was ready for discharge in February 2013 "but wasn't [allowed] to be discharged due to concerns regarding [Mother's] behavior" and because Mother had "failed to complete [the] required training to learn how to care for both children." Eventually, the Department was able to place Girl in a foster home, while Boy remained in Cook Children's.

Dalton detailed how she had prepared, and provided Mother with, a service plan and also established a liaison with Cook Children's, who was designated to supervise Mother's potential visits with Boy and Girl. Dalton had arranged for bimonthly visits between Mother and the children, but during the period that Dalton worked the case, Mother had only visited each child once.

7

Dalton testified that during her initial meeting with mother, which took place on March 6, 2013, Mother stated that she lived with a friend in Arlington, Texas. Mother also admitted to marijuana use on the "day of removal." By late May 2013, Mother told Dalton that she had moved to Dallas to live with the children's maternal grandmother, who had moved to Dallas specifically so that Mother could participate in the children's lives. According to Dalton, the maternal grandmother has "some criminal history" which precluded her from placement for either child. Dalton also said that Mother has another child, born before the children subject to this suit, who had been placed with a paternal grandmother.

Dalton further testified that during her assignment to the case, Mother never demonstrated the ability to provide "safe and stable housing" for the children and that she failed to maintain "contact with the Department." Furthermore, according to Dalton, Mother never demonstrated that she could provide for the children's medical needs and failed to take advantage of available training to learn how to provide for the children's medical concerns. Dalton said that despite available "in-home" counseling and nearby parenting classes, Mother only met with the counselor twice. Moreover, Dalton testified that despite the Department's efforts to transport Mother to Girl for visitation, Mother did not avail herself of that opportunity.

Stephanie Roesch, a conservatorship worker for the Department, also testified. Roesch said that at the time of trial, she was the current caseworker for Boy and Girl. Roesch averred that both children were currently doing "really well"

in their environments.   By Roesch's account, both of the children were in separate foster homes because of their "special needs."  Roesch averred that the children's needs were "just too much at the time for one family to take in" both children.   Roesch said that both children "have some issues with their eyes focusing and staying on the same pattern" and that both are "going to be developmentally delayed."

Specifically to Boy, Roesch said that he was currently in a foster home, that he was developing the ability to crawl and "scoot," and that being in a "home environment ha[d] really helped [him] a lot."  Roesch described the relationship between Boy and his foster mom as "very appropriate."  Roesch said that Boy is required to wear a "Passy-Muir"[3] but is now "trying to learn how to talk" since being in foster care.  And, according to Roesch, the foster home was attempting to utilize the Passy-Muir at longer intervals so that eventually he will be able to have his trach permanently removed by summer's end.  Roesch testified that Boy

---

[3]The Passy-Muir speaking valve is commonly used to help patients speak more normally.   This one-way valve attaches to the outside opening of a tracheostomy tube and allows air to pass into the tracheostomy, but not out through it.   The valve opens when the patient breathes in.   When the patient breathes out, the valve closes and air flows around the tracheostomy tube, up through the vocal cords, allowing sounds to be made.   The patient breathes out through the mouth and nose instead of the tracheostomy.   *See* http://www.hopkinsmedicine.org/tracheostomy/living/passey-muir_valve.html (last visited December 18, 2014).

receives food through a "G-button[4] . . . . But he's really done well in the foster home."

Specifically to Girl, Roesch said that Girl has "a mild case of cerebral palsy" and also has a G-button. Further, medical tests reveal that she may be susceptible to seizures. According to Roesch, in her current setting, Girl is "now standing up and using furniture to move around." Roesch also described that Girl has "hydrocephalus," requiring her to have a "VP shunt," but that since she had been in a foster home, Girl's eating disorder was "under control."

Roesch testified that despite the difficulties involved in providing both children their specialized medical care, Boy's foster mother "is real interested in taking in [Girl], as well, so [that the two children] can be together" as soon as Boy's foster mother is comfortable providing Boy with his medical needs. Roesch said that it was "too early" to know whether a family will adopt either or both children, but that the children would still benefit from the Department's programs by the Department being permanent managing conservator.

Speaking of Mother, Roesch said that Mother had told her conflicting stories as to whether she had taken parenting classes. Roesch said that initially Mother said that she had received a "certificate" for completion of parenting

---

[4]A gastrostomy tube (also called a G-tube or G-button) is a tube inserted through the abdomen that delivers nutrition directly to the stomach. It's one of the ways doctors can make sure kids with trouble eating get the fluid and calories they need to grow. *See* http://kidshealth.org/parent/system/surgery/g_tube.html (last visited December 18, 2014).

classes, but when Roesch pressed Mother, Mother admitted that she had only attended two or three classes. According to Roesch, Mother said that she had attended so few classes because "her schedule [was] too busy." Roesch said that during the time that she has been assigned to this case, Mother had never visited either child. Much like South and Dalton, Roesch testified that Mother failed to take advantage of numerous services offered to her by the Department which would have facilitated visitation and Mother learning to care appropriately for both Boy and Girl. And similar to the testimony of South and Dalton, Roesch testified that Mother had failed to demonstrate an ability to provide a safe and stable living environment for the children. Roesch also said that Mother had simply not "done any of her services."

Roesch stated that she believed it would be in the best interest of both children if Mother's parental rights were terminated so that the Department could attempt to find a "permanent home that they can grow up in instead of going from what could possibly be foster care home to foster care home." Roesch said that the Department's goal was to find an adoptive home for both children. But Roesch also stated that even if the Department could not find a permanent adoptive home, both children would at least "be in a medical needs [foster] home [] where they [would get] the care that they need."

After hearing and considering all of the evidence, the trial court terminated Mother's parental rights to both Boy and Girl. The court found that termination was in both children's best interest and that Mother had constructively

11

abandoned the children, who had been in the permanent or temporary managing conservatorship of the Department or an authorized agency for not less than six months. *See* Tex. Fam. Code Ann. §§ 161.001(1)(N), (2) (West 2014). The trial court also appointed the Department permanent managing conservator of Boy and Girl. This appeal followed.

### III. DISCUSSION

### A. Termination of Mother's Parental Rights

In her first and second issues, Mother argues that the evidence is legally and factually insufficient to support the grounds for termination under section 161.001(1)(N) and to support the trial court's finding that termination of her parental rights was in the best interests of Boy and Girl. The Department responds that the evidence is both legally and factually sufficient to support the challenged findings. We agree with the Department.

### 1. Termination of Parental Rights in General

A parent's rights to "the companionship, care, custody and management" of her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982). "While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

In a termination case, the State seeks not just to limit parental rights but to end them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (West 2014); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re D.T.*, 34 S.W.3d 625, 630 (Tex. App.—Fort Worth 2000, pet. denied) (op. on reh'g).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one or more of the acts or omissions enumerated under subdivision (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *Richardson v. Green*, 677 S.W.2d 497, 499 (Tex. 1984); *Swate v. Swate*, 72 S.W.3d 763, 766 (Tex. App.—Waco 2002, pet. denied). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

Termination of parental rights is a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by "clear and convincing evidence." Tex. Fam. Code Ann. §§ 161.001, 161.206(a); *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980). This intermediate standard falls between the preponderance standard of ordinary civil proceedings and the

13

reasonable doubt standard of criminal proceedings. *G.M.*, 596 S.W.2d at 847; *D.T.*, 34 S.W.3d at 630. It is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007.

The higher burden of proof in termination cases alters the appellate standard of legal sufficiency review. *In re J.F.C.*, 96 S.W.3d 256, 265 (Tex. 2002). The traditional no-evidence standard does not adequately protect the parent's constitutional interests. *Id.* In reviewing the evidence for legal sufficiency in parental termination cases, we must determine "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction" that the grounds for termination were proven. *Id.* at 265–66. We must review all the evidence in the light most favorable to the finding and judgment. *Id.* at 266. This means that we must assume that the factfinder resolved any disputed facts in favor of its finding if a reasonable factfinder could have done so. *Id.* We must also disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We must consider, however, undisputed evidence even if it does not support the finding. *Id.*

The higher burden of proof in termination cases also alters the appellate standard of factual sufficiency review. *C.H.*, 89 S.W.3d at 25 (Tex. 2002). "[A] finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance." *Id.* In considering whether the evidence of termination rises to the level of being

14

clear and convincing, we must determine "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction" that the grounds for termination were proven. *Id.* Our inquiry here is whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that Mother violated section 161.001(1)(N) and that the termination of the Mother's parental rights would be in the best interests of the children. *Id.* at 28.

### 2. Constructive Abandonment

To establish constructive abandonment under section 161.001(1)(N), the Department must prove by clear and convincing evidence that: (1) Mother constructively abandoned Boy and Girl, who had been in the temporary managing conservatorship of the Department for not less than six months; (2) the Department made reasonable efforts to return Boy and Girl to Mother; (3) Mother has not regularly visited or maintained significant contact with Boy and Girl; and (4) Mother has demonstrated an inability to provide Boy and Girl with a safe environment. Tex. Fam. Code Ann. § 161.001(1)(N); *In re K.M.B.*, 91 S.W.3d 18, 25 (Tex. App.—Fort Worth 2002, no pet.). Because Mother concedes that the Department met its burden with respect to the first element, we need only address whether there is legally and factually sufficient evidence that the Department made reasonable efforts to return Boy and Girl to Mother, that Mother has not regularly visited or maintained significant contact with the children, and that she has not demonstrated an ability to provide Boy and Girl

15

with a safe environment. *See* Tex. Fam. Code Ann. § 161.001(1)(N); *K.M.B.*, 91 S.W.3d at 25.

Here, the Department made reasonable efforts to return Boy and Girl to Mother. A family service plan was prepared, and according to evidence adduced at trial, multiple Department caseworkers went over the plan with Mother, explaining the Department's expectations. The plan provided opportunities for Mother to partake in a number of services to restore her parental rights, including counseling services, parenting classes, and specialized training from the Department and Cook Children's concerning the children's specialized medical needs. The Department also went to extraordinary measures to provide for visitations between Mother and the children, including purchasing bus tickets for transportation to the hospital, most of which Mother did not use. The preparation and administration of the service plan and the measures taken by the Department to facilitate visitation and special medical-needs training show that the Department made reasonable efforts to reunite Mother with Boy and Girl. *See K.M.B.*, 91 S.W.3d at 25 (reasoning that preparation and administration of service plans by the Department are reasonable efforts to reunite a parent and a child).

Moreover, Mother did not regularly visit and maintain significant contact with the children. According to her service plan, Mother was to visit both children bimonthly and she was also required to attend specialized medical training visitations for the children. Multiple Department caseworkers testified that

16

Mother had only visited Boy once and Girl twice during the more than year-long period when the Department served as their temporary managing conservator. Despite the Department having taken extraordinary measures to help contact, promote, and facilitate visitations, Mother did not avail herself of these opportunities. Based on these facts, it is clear that Mother did not regularly visit or maintain significant contact with Boy and Girl. *See In re H.R.*, 87 S.W.3d 691, 699 (Tex. App.—San Antonio 2002, no pet.); *In re P.R.*, 994 S.W.2d 411, 416 (Tex. App.—Fort Worth 1999, pet. dism'd w.o.j.) (holding that sufficient evidence existed to support constructive abandonment finding where mother visited children sporadically, had unsteady employment history, and had no permanent housing), *disapproved on other ground* by In re J.F.C., 96 S.W.3d at 267.

Finally, Mother demonstrated an inability to provide the children with a safe environment. After both children arrived at Cook Children's, hospital employees reported to the Department their concern that Mother lacked the ability to provide a safe environment for the children. Multiple caseworkers testified that Mother's home environment was sporadic and nomadic, including a stint in jail while the Department served as temporary managing conservator. Mother's employment history is foggy, and even though the children's maternal grandmother had moved to Dallas so that Mother could be near the children, testimony adduced at trial demonstrated that Mother had lived with the maternal grandmother, whom the Department had concerns with over past criminal history; she had lived far enough away to require busing to the hospital; and she had also lived with a

17

boyfriend. While Girl remained hospitalized for months after her birth and Boy remained hospitalized for over a year due to extreme medical conditions, Mother made no attempts to gather basic necessities for them such as a crib, food, diapers, or clothing. Further, Mother did not take advantage of specialized training offered by the Department and Cook Children's on how to deal with either child's extraordinary medical needs, some of which require the removal and cleaning of medical devices installed to help facilitate the children's needs to eat and breathe.

After the Department's involvement in the children's lives, multiple caseworkers testified that Mother had no permanent housing and that she lacked the ability to provide a safe and stable environment for either child. She also demonstrated the lack of desire to transport herself to and from the hospital to care for the children, and even though Mother claimed to multiple caseworkers that she was employed, she never provided any documentation that she ever has been during the case. In fact, there is evidence in the record that Mother used the excuse of her working as a reason for her failure to visit the children, attend services, or participate in the specialized training necessary to care for the medically challenged children.

Further, Mother expressed to caseworkers that she had "drug use concern history," and there was testimony at trial that Mother suffered from mental-health issues. Despite claims that she completed parenting classes, Mother admitted that she had attended only a few classes, and the evidence is that she simply

18

failed to attend the necessary parenting classes as requested by the Department and that she failed to take advantage of in-home counseling. Given the children's extreme needs for specialized medical care, Mother's nomadic living habits, demonstrative lack of living stability, and complete lack of effort to learn to cope with the children's medical needs, there are serious questions as to whether she could attend to either child's heath concerns. One caseworker testified that Mother had simply never demonstrated an ability to care for even the basic needs of the children, much less their specialized medical needs. Therefore, after reviewing all of the evidence in the record, we find that Mother demonstrated an inability to provide the children with a safe environment. *See In re J.J.O.*, 131 S.W.3d 618, 630 (Tex. App.—Fort Worth 2004, no pet.) (attending only half of her parenting classes, lacking steady housing and employment, and missing the opportunity for counseling and a psychological evaluation demonstrated mother's inability to provide child with safe environment); *In re M.D.L.E.*, No. 09–05–00514–CV, 2007 WL 685562, at *8 (Tex. App.—Beaumont Mar. 8, 2007, no pet.) (mem. op.) (reasoning that mental-health issues and lack of steady employment and housing demonstrated inability to provide child with safe environment).

After carefully reviewing and considering the evidence, we hold that the evidence is both legally and factually sufficient to support the trial court's finding that Mother constructively abandoned both Boy and Girl. *See* Tex. Fam. Code Ann. § 161.001(1)(N); *In re R.M.*, No. 14–02–00221–CV, 2003 WL 253291, at *5

19

(Tex. App.—Houston [14th Dist.] Feb. 6, 2003, no pet.) (memo. op.) (holding evidence legally and factually sufficient to show appellant did not regularly visit or maintain significant contact with child); *H.R.*, 87 S.W.3d at 699 (holding evidence sufficient to support finding that mother constructively abandoned child where mother failed to fulfill requirements of service plan to regain custody of child and rarely visited child); *P.R.,* 994 S.W.2d at 416 (holding evidence sufficient to support finding of constructive abandonment when mother visited the children only sporadically, had an unstable employment history, and had no permanent residency), *disapproved on other grounds by J.F.C.*, 96 S.W.3d at 267. We now turn to whether there was sufficient evidence to support the best interest finding.

### 3.    Best-Interest Finding

A statutory act of omission or commission must be coupled with a finding that termination of the parent-child relationship is in the best interest of the child. Tex. Fam. Code Ann. § 161.001(2); *See In re A.B.*, 269 S.W.3d 120, 127 (Tex. App.—El Paso 2008, no pet.). In reviewing the sufficiency of the evidence to support the second prong, we apply the non-exclusive factors found in *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). Those factors include: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the plans for the child by these individuals; (6) the stability of the home; (7) the acts or omissions of the parent which may indicate that the existing parent-child

20

relationship is not a proper one; and (8) any excuse for the acts or omissions of the parent. *Holley*, 544 S.W.2d at 371–72.

The *Holley* factors, however, are not exhaustive, and no single consideration is controlling. *A.B.*, 269 S.W.3d at 126. Nor is a factfinder required to consider all of them. *Holley*, 544 S.W.2d at 372. Undisputed evidence of just one factor may be sufficient to support a finding that termination is in the best interest of a child. *C.H.*, 89 S.W.3d at 27. But on the other hand, the presence of scant evidence relevant to each *Holley* factor will not support a finding. *Id.*; *A.B.*, 269 S.W.3d at 126.

Here, evidence at trial showed that the emotional and physical needs of both children now and in the future are extreme and that Mother is incapable of meeting them. Specifically, both children require medical monitors and specialized medical equipment for their congenital medical conditions. As to Boy, record evidence demonstrates that Boy is required to wear a Passy-Muir device and that he receives food via a G-button. Mother has demonstrated a lack of effort to learn how to care for Boy's specialized medical needs, while his current foster mother is trained to care for his specialized needs and does so. As to Girl, record evidence demonstrates that she has "a mild case of cerebral palsy," has her own G-button, and may be susceptible to seizures. In contrast to Mother's lack of interest in training in order to properly care for Girl's specialized needs, according to record testimony, in Girl's current setting she is "now standing up and using furniture to move around." Further, evidence adduced at

21

trial also revealed that Girl has "hydrocephalus," requiring her to have a "VP shunt," but that since she's been in a foster home, Girl's eating disorder is "under control."

Concerning the emotional and physical dangers to the children now and in the future, evidence at trial showed that Mother failed to learn how to properly treat either Boy or Girl's medical conditions; thus, if returned to her, the children would not receive the serious medical treatment and care that they need, exposing them to physical danger. Testimony at trial was that Mother lacks even the ability to provide the children's basic nutritional needs. Mother lives a nomadic lifestyle, including living with a family member who has a criminal history, and Mother also has a criminal history, having spent time in jail herself while the children were at Cook Children's. In contrast, both children are currently in foster homes which provide for their basic and medical needs, and both children have shown developmental growth in their current environments.

The Department's goals are to find an adoptive home for both Boy and Girl. And even though testimony revealed that the medical needs that both of these children possess make adoption more difficult than it is for children without such needs, even being placed in the Department's adoptive program or remaining in foster care provides them with the medical care that they need and a stability that Mother has demonstrated she is simply incapable of providing or is unwilling to provide.

Furthermore, Mother's lack of participation in her service plan, her lack of effort to learn how to properly treat the children's medical needs, her nomadic living, her demonstrated drug use and criminal history, and her lack of visitation with the children while they remain under the Department's temporary managing conservatorship despite extraordinary efforts on the part of the Department to facilitate such training and visitation, indicate that the existing parent-child relationship was not a proper one. *See Holley*, 544 S.W.2d at 371–72.

In reviewing the evidence, we conclude that a reasonable factfinder could have formed a firm belief or conviction that termination was in the best interests of both Boy and Girl. *R.M.*, 2003 WL 253291, at *5 (holding termination of parental rights was in the best interest of child where mother never provided attentive care, failed to obtain appropriate medical care for child, did not visit child, and did not have stable residence or employment). Having determined that the evidence was legally and factually sufficient to terminate Mother's parental rights, we overrule her first two issues.

## B. Department as Permanent Sole Managing Conservator

In her third issue, Mother argues that the evidence is legally and factually insufficient to support the trial court's appointment of the Department as permanent sole managing conservator of the children. As the Department points out, Mother's argument is predicated on the assumption that we agree that the trial court erred by finding that Mother had constructively abandoned Boy and Girl and that termination of Mother's parental rights was in the children's best

23

interests.  Otherwise, Mother presents no argument or analysis as to why the Department should not be named permanent sole managing conservator.  *See Wheeler v. Methodist Hosp.*, 95 S.W.3d 628, 646 (Tex. App.—Houston [1st Dist.] 2002, no pet.) (holding issue inadequately briefed when party did little more than summarily state his point of error, without citations to legal authority or substantive analysis); *Velasquez v. Waste Connections, Inc.*, 169 S.W.3d 432, 436 (Tex. App.—El Paso 2005, no pet.) (holding issue inadequately briefed when argument did not contain any references to relevant cases or legal principles). Because we have overruled Mother's first and second issues and because she otherwise does not present an issue for appellate review in the remainder of her third issue, we overrule her third issue.

## IV. CONCLUSION

Having overruled all three of Mother's issues on appeal, we affirm the trial court's judgment.

PER CURIAM

PANEL:  MEIER, DAUPHINOT, and GARDNER, JJ.

DELIVERED:  December 23, 2014

24